## STATE OF CONNECTICUT *v.* ALEX KELLY
## (SC 16020)

McDonald, C. J., and Norcott, Katz, Sullivan, Lavery, Landau and Vertefeuille, Js.*

* The listing of justices reflects their seniority status on this court as of the date of argument.

Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion was officially released, his continued participation on this panel is authorized by General Statutes § 51-198 (c).

Argued December 8, 1999—officially released May 8, 2001

*Thomas P. Puccio*, pro hac vice, with whom were *Hope C. Seeley*, and, on the brief, *Hubert J. Santos* and *Patrick S. Bristol*, for the appellant (defendant).

*Robert M. Spector*, deputy assistant state's attorney, with whom were *Bruce Hudock*, senior assistant state's attorney, and, on the brief, *Eugene Callahan*, state's attorney, and *Susan C. Marks*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. A jury found the defendant, Alex Kelly, guilty of sexual assault in the first degree in violation of General Statutes (Rev. to 1985) § 53a-70 (a).[1] The trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to twenty years imprisonment, execution suspended after sixteen years, and ten years probation.[2] The defendant appealed, raising multiple claims of alleged impropriety by the trial court. We transferred the appeal to this court

---

[1] General Statutes (Rev. to 1985) § 53a-70 (a), the statutory revision in effect at the time of the commission of the crime, provides in pertinent part: "A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

[2] The defendant also was charged in the amended information with kidnapping in the first degree in violation of General Statutes (Rev. to 1985) § 53a-92 (a) (2) (A). After the close of the state's case, the trial court granted the defendant's motion for judgment of acquittal on that charge.

pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The jury reasonably could have found the following facts. After attending a high school basketball game, on the evening of February 10, 1986, the victim, a sixteen year old high school junior,[3] and several other high school students visited together at a friend's house in Darien. As the victim's curfew approached, she asked several of her friends for a ride home; all of them declined. The defendant, who had arrived shortly before the victim began seeking a ride, offered to drive her home. Although she declined the defendant's offer initially because she was unacquainted with him, the victim eventually accepted his offer after her friend had pointed out that he lived near her home. At the time, the defendant was driving his girlfriend's Jeep Wagoneer.

At a stop sign approximately one mile from the victim's home, the defendant put the vehicle in park, "came over on top of [her]" and attempted to kiss her. The victim told the defendant to stop and pushed him away. The defendant resumed driving and then asked the victim if she wanted to smoke marijuana with him. She declined. The victim pointed out her house, but the defendant continued driving. He turned down a street past the victim's house and parked the vehicle at the end of a cul-de-sac.

---

[3] In accordance with General Statutes § 54-86e, and in order to protect the victim's legitimate privacy interests, the victim's name is not used in this opinion. Section 54-86e provides: "Confidentiality of name and address of victim of sexual assault. Availability of information to accused. The name and address of the victim of a sexual assault under section 53a-70, 53a-70a, 53a-71, 53a-72a, 53a-72b or 53a-73a, or injury or risk of injury, or impairing of morals under section 53-21, or of an attempt thereof shall be confidential and shall be disclosed only upon order of the Superior Court, except that such information shall be available to the accused in the same manner and time as such information is available to persons accused of other criminal offenses."

The defendant again attempted to kiss the victim. When she pushed him away, he grabbed her throat and began to choke her. The defendant then told the victim that she was going to make love to him or he was going to kill her. He straddled her, keeping his left hand on her throat, and ordered her to get to the back of the car. He pushed her through the middle of the front seats into the rear and continued pushing her back until her head was against the rear door of the Jeep. The defendant pulled down the victim's jeans and ordered her to remove her shirt and sweater, which she did. The defendant again put one hand on the victim's throat and pushed his fingers into her vagina. He then forced her legs apart, choking her harder when she tried to resist. The defendant penetrated the victim with his penis with such force that her head was banging against the rear door. When the attack was over, the defendant told the victim to get dressed. As she rolled over, she saw blood on her legs and on the carpet beneath her. The defendant threatened the victim that if she told anyone what had happened, he would assault her again and kill her. He then drove her to her home.

The victim arrived home visibly upset. She told her father that she was upset because she had argued with a friend. A short time later, the victim's older sister, seeing how extremely troubled she was, asked the victim repeatedly what had happened. After making her sister promise not to tell anyone, the victim finally disclosed that the defendant had sexually assaulted her. At the urging of her sister and her brother, whom she subsequently had told, the victim then told her parents that the defendant had sexually assaulted her. Because she was afraid, however, she refused to go to the hospital or call the police that night. The following day, the victim went to see a doctor because she was experiencing pain. She also informed the police, who later arrested the defendant.

In 1987, the defendant fled the country while awaiting trial. Eight years later, in 1995, the defendant surrendered to authorities in Switzerland and he was returned to this country for trial. Additional facts will be provided as necessary.

## I

The defendant first claims that the trial court improperly denied his challenges for cause to excuse four of the venirepersons. Specifically, the defendant contends: (1) that the trial court's denial of his challenges for cause improperly forced him to use four of his peremptory challenges to remove the venirepersons, thereby violating his state constitutional right to a jury trial; and (2) that the failure to excuse those four venirepersons for cause constituted an abuse of the trial court's discretion. We disagree.

Certain additional facts are necessary for the resolution of this issue. Prior to voir dire, the trial court granted the defendant's motion for additional peremptory challenges, allotting sixteen challenges, twice the normal amount, to each side. See General Statutes § 54-82h. The trial court also advised the parties that they could request additional peremptory challenges if needed. During the lengthy jury selection, the trial court denied the defendant's challenges for cause to venirepersons D.U., G.R., B.V. and K.J.[4] The defendant then exercised four of his peremptory challenges to excuse those venirepersons. When jury selection was concluded, the defendant still retained one of the sixteen peremptory challenges that he had been given by the trial court.

The defendant claims that the trial court's denial of his challenges for cause to these four venirepersons

---

[4] We use the initials of the four venirepersons to protect their privacy. See *State* v. *Hodge*, 248 Conn. 207, 229 n.25, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).

improperly forced him to use four of his peremptory challenges in violation of his right to a jury trial pursuant to article first, § 19, of the Connecticut constitution, as amended by article four of the amendments,[5] and further, that it constituted an abuse of the trial court's discretion. These claims are without merit.[6]

Article first, § 19, "reflects the abiding belief of our citizenry that an impartial and fairly chosen jury is the cornerstone of our criminal justice system."[7] (Internal quotation marks omitted.) *State* v. *Day*, 233 Conn. 813, 845, 661 A.2d 539 (1995). "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . *Irvin* v. *Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); *State* v. *Tucker*, 226 Conn. 618, 630, 629 A.2d 1067 (1993); *State* v. *Cubano*, 203 Conn. 81, 88, 523 A.2d 495 (1987); *State* v. *Ziel*, 197 Conn. 60, 64, 495 A.2d 1050 (1985)." *State* v. *Day*, supra, 843.

We have held, however, that even an improper denial of a challenge for cause provides cause for reversal *only* if "the party [who makes the challenge] subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied." (Internal quotation marks omitted.) *State* v. *Esposito*, 223 Conn. 299, 313, 613 A.2d 242 (1992). In this case, the defendant exercised only fifteen of his sixteen peremptory challenges and never sought any additional challenges. Accordingly, he cannot prevail on his claim that the trial court's denial of four of his challenges for cause was improper.[8]

---

[5] The defendant never raised this constitutional claim at trial.

[6] Because the defendant's claims involve a question of law, we review them de novo. See *State* v. *Webb*, 252 Conn. 128, 138, 750 A.2d 448 (2000).

[7] Article first, § 19, of the Connecticut constitution, as amended by article four of the amendments, provides in relevant part: "In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. . . ."

[8] Although the defendant urges us to overrule *Esposito*, he advances no cogent reason for so doing. Moreover, in spite of the defendant's contention

## II

The defendant next claims that the trial court improperly denied his pretrial motion to sequester the jury due to the pretrial publicity surrounding the case and thereby deprived him of the right to a fair trial. We disagree.

It is well settled that the decision whether to sequester the jury rests within the sound discretion of the trial court, and is one that we will not disturb on appeal absent a clear abuse of that discretion. *State* v. *Piskorski*, 177 Conn. 677, 691, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). "Sequestration is an extreme measure, one of the most burdensome tools of the many available to assure a fair trial." (Internal quotation marks omitted.) *United States* v. *Greer*, 806 F.2d 556, 557 (5th Cir. 1986). Therefore, "it is only when there is shown to exist a trial atmosphere . . . utterly corrupted by press coverage; *Dobbert* v. *Florida*, [432 U.S. 282, 303, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977)]; that unfairness of constitutional magnitude will be presumed." (Internal quotation marks omitted.) *State* v. *Piskorski*, supra, 692.[9]

to the contrary, our rule remains in accordance with the vast majority of jurisdictions that have considered this issue, which have required a defendant to exhaust his peremptory challenges before claiming error in the trial court's denial of his challenges for cause. See, e.g., *Bangs* v. *State*, 338 Ark. 515, 525, 998 S.W.2d 738 (1999); *People* v. *Waidla*, 22 Cal. 4th 690, 996 P.2d 46, 60, 94 Cal. Rptr. 2d 396 (2000); *Hill* v. *State*, 477 So. 2d 553, 556 (Fla. 1985); *State* v. *Wessinger*, 736 So. 2d 162, 178 (La. 1999); *State* v. *Simon*, 161 N.J. 416, 466, 737 A.2d 1 (1999); *People* v. *Brown*, 269 App. Div. 2d 817, 704 N.Y.S.2d 416 (2000); *Long* v. *State*, 10 S.W.3d 389, 395 (Tex. Crim. App. 2000).

[9] In addition to his claim of inherent prejudice, the defendant also argues that the jury in this case *actually* was prejudiced by the degree of pretrial publicity. It is true that a defendant may establish prejudice due to a failure to sequester the jury by demonstrating that, as a result of media publicity about the crime, "jurors exhibited actual partiality or hostility that could not be laid aside." (Internal quotation marks omitted.) *United States* v. *Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996). The record is devoid, however, of any evidence that any of the jurors disregarded the trial court's careful instructions regarding publicity, or otherwise were exposed to any signifi-

The classic example of a trial atmosphere "utterly corrupted by press coverage"; (internal quotation marks omitted) id.; is that which was described in *Sheppard* v. *Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). As we described in *State* v. *Piskorski*, supra, 177 Conn. 687, in the criminal defendant's underlying murder trial "[i]n *Sheppard*, there was massive pretrial and trial publicity to which the jury was exposed which included, inter alia, live television coverage of a three-day inquest three months before trial at which the defendant was examined for more than five hours without counsel; massive publicity of 'evidence' never offered in the trial including charges that the defendant was impeding the investigation, that he had committed perjury, and that a woman convict claimed [he was] the father of her illegitimate child; and media accounts of the trial which summarized and interpreted the evidence devoting particular attention to that which incriminated the defendant, and which often drew unwarranted inferences from trial testimony. *Sheppard* v. *Maxwell*, supra, 354, 356–57."

Although, as the defendant in the present case points out, there was a great deal of pretrial publicity concerning his case, followed by very intense media scrutiny of the trial itself, we cannot say that the trial court abused its discretion by denying the defendant's motion to sequester the jury. Certainly, this case is a far cry from *Sheppard*, in which "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial . . . ." *Sheppard* v. *Maxwell*, supra, 384 U.S. 355. There is nothing in the record of this case to suggest that the trial atmosphere was utterly corrupted by media coverage. As the United States Supreme Court has noted, "[i]f the mere opportunity for prejudice or

cant corrupting influences once the trial had begun. The defendant's claim, therefore, is without merit.

corruption is to raise a presumption that they exist, it will be hard to maintain jury trial[s] under the conditions of the present day." *Holt* v. *United States*, 218 U.S. 245, 251, 31 S. Ct. 2, 54 L. Ed. 1021 (1910).

It is true that, in one instance, the United States Supreme Court held that pretrial publicity alone, without an attendant circus-like trial atmosphere, was sufficient to establish a violation of the right to a fair trial. See *Rideau* v. *Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963). Unlike the present case, however, in *Rideau*, the defendant's confession, obtained in a police interrogation, was broadcast three times by a television station in the small town where both the crime and the trial took place. Id., 724. The result, as the Supreme Court noted, was to render "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle . . . but a hollow formality." Id., 726.

In contrast to *Rideau*, although the jurors in the present case most likely had been exposed to at least some pretrial publicity concerning the defendant, the corrupting influence of that publicity was overcome by the lengthy voir dire and the trial court's careful instructions to the jurors. "Where, as here, explicit warnings are given to the jurors by the trial court and no demonstration of actual prejudice to the defendant has been made, the trial court's failure to sequester the jury, in the exercise of its discretion, is not reversible error." *State* v. *Piskorski*, supra, 177 Conn. 692–93. Indeed, as this court noted in *State* v. *Crafts*, 226 Conn. 237, 257–58, 627 A.2d 877 (1993), "[a] defendant cannot rely . . . on the mere fact of extensive pretrial news coverage to establish the existence of inherently prejudicial publicity. Prominence does not, in itself, prove prejudice. . . . The defendant must demonstrate that the publicity was so inflammatory or inaccurate that it created a

trial atmosphere utterly corrupted by press coverage." (Citation omitted; internal quotation marks omitted.)

In *Crafts*, the publicity consisted of factual descriptions of information gathered by the police. In particular, "virtually all [of the] stories highlighted the state's theory of the case—that the victim was intentionally killed and later her body was disposed of through a woodchipper—and the state's arrest of the defendant. The case was occasionally referred to in the press as the 'woodchipper murder case.' " Id., 258. Similar to the present case, a first trial against the defendant in *Crafts* ended in a mistrial that received significant media attention and fostered widespread public speculation about the case. In *Crafts*, this court concluded that "[a]lthough the press at times drew dramatic conclusions on the basis of the information, and at times engaged in speculation, none of the coverage was so inflammatory as to prevent the empaneling of a jury dedicated to objectivity and to following the trial court's instructions." Id., 258.

The press coverage of the present case was certainly no more pervasive or prejudicial than in *Crafts*, and, consequently, we conclude that the defendant's due process right to a fair and impartial jury was not violated. As was the case in *Piskorski* and *Crafts*, we conclude here that the trial court's decision not to sequester the jury did not constitute an abuse of its discretion.

## III

The defendant next urges this court to abandon the constancy of accusation doctrine. The defendant claims that the admission of constancy of accusation testimony infringes upon his constitutional rights under the confrontation and due process clauses of the sixth and fourteenth amendments to the United States constitu-

tion and article first, § 8, of the Connecticut constitution. We refuse to abandon the doctrine.

This court recently examined and limited the role of the constancy of accusation doctrine in our courts in *State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996). On the facts of this case, we see no reason to reconsider *Troupe*.

## A

In *Troupe*, this court unanimously voted that the time had come to reexamine and severely limit the application of the constancy of accusation doctrine in Connecticut. Id., 293–94. No longer would witnesses in sexual assault cases be allowed to give detailed testimony as to the nature and circumstances of the offense alleged as reported to them by the victim. This court held that, prospectively, constancy of accusation witnesses in sexual assault cases would be confined to testify only regarding the fact that the victim complained to them, the time when that complaint was made, and the limited details of the assault, including the identity of the alleged perpetrator as reported to the witness by the victim. Id., 304. "Accordingly . . . a person to whom a sexual assault victim has reported the assault may testify only with respect to the fact and timing of the victim's complaint; any testimony by the witness regarding the details surrounding the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example, the time and place of the attack or the identity of the alleged perpetrator." Id. Additionally, to admit the constancy of accusation testimony, the trial court must nevertheless, "balance the probative value of the evidence against any prejudice to the defendant." Id., 305.

This court noted that "[o]f course, the rule that we adopt today does not affect those cases in which the details of a sexual assault complaint are otherwise

admissible, as, for example, in the case of a spontaneous utterance . . . ." Id., 304 n.19. Thus, the rule adopted in *Troupe* did not affect other rules of evidence or render inadmissible evidence that would otherwise be admissible under other rules of evidence, such as exceptions to the general rule against hearsay.

### B

In the alternative, the defendant argues that the trial court abused its discretion in allowing eight constancy of accusation witnesses to testify in violation of his due process rights. We do not agree.

During the early morning hours of February 11, 1986, the victim first complained of the sexual assault to several family members, including her sister, her brother, her mother and her father. The victim had first complained to her sister when she entered the victim's bedroom to check on her almost immediately after the victim had returned home from the assault. The victim's sister then telephoned her brother, who was away at college, to whom the victim next disclosed that she had been sexually assaulted. Thereafter, the victim spoke to her parents simultaneously in their bedroom after her father had been informed of the assault by the victim's brother.

On the evening of February 11, 1986, the victim made an initial complaint to Detectives Hugh McManus and Ronald Bussell of the Darien police department, the investigating police officers, upon her arrival at the police station. She subsequently filed her official, written complaint with Rebecca Hahn, another Darien police officer. The victim was examined by Marilyn Kessler, her treating gynecologist, the day after the sexual assault, and she repeated her complaint to Kessler at that time.

At trial, the state called six constancy of accusation witnesses who testified as to the fact and timing of

the victim's complaint.[10] These witnesses included the victim's mother, father and brother, and three members of the Darien police department, McManus, Bussell and Hahn. Each of these witnesses answered the same four leading questions concerning the fact and the timing of the complaint in accordance with *Troupe*.[11]

Prior to our decision in *Troupe*, in *State* v. *Parris*, 219 Conn. 283, 293–94, 592 A.2d 943 (1991), this court held that the trial court properly admitted testimony of four constancy of accusation witnesses and that such testimony was not cumulative.[12] While such evidence was "overlapping in the sense that it related to the same incident, pertained to a different statement that the victim made to a different person at a different point in time . . . [and demonstrated that the victim] previously had reported the incident . . . in a constant and consistent fashion." Id., 294. The Appellate Court also has upheld trial court decisions to admit as many as eight constancy of accusation witnesses.[13]

The defendant contends that the testimony of both of the victim's parents and both of the Darien detectives

[10] The defendant contends that there were, in fact, eight constancy of accusation witnesses presented by the state. We disagree. The more detailed testimony of the victim's sister and her gynecologist was admissible independently under the spontaneous utterance and treating physician exceptions to the hearsay rule, respectively. As such, that testimony is not bound by the constraints of the *Troupe* doctrine and is not considered for purposes of the number of constancy of accusation witnesses presented. We address the admissibility of the testimony of the victim's sister and her treating physician separately in part IV of this opinion.

[11] The prosecutor was allowed to ask each of the six witnesses: (1) whether the victim, in fact, had complained to them; (2) when she complained; (3) whether the complaint involved a sexual assault; and (4) who was the reported perpetrator of that sexual assault.

[12] Indeed, the witnesses in *Parris* were allowed to testify as to all of the details surrounding the complaint.

[13] See *State* v. *Zoravali*, 34 Conn. App. 428, 440, 641 A.2d 796, cert. denied, 230 Conn. 906, 644 A.2d 921 (1994); *State* v. *Parsons*, 28 Conn. App. 91, 105–106, 612 A.2d 73, cert. denied, 223 Conn. 920, 614 A.2d 829 (1992).

was particularly cumulative because the parents simultaneously heard one accusation, as did the detectives, and the testimony, therefore, was overlapping. Although the testimony of both parents and both investigating officers was cumulative in that, in each situation two witnesses were testifying to the same statement made by the victim, we conclude that the admission of the statements was harmless, under the circumstances of this case. "It is a fundamental rule of appellate review of evidentiary rulings that if [the] error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him." *State* v. *Vitale*, 197 Conn. 396, 403, 497 A.2d 956 (1985). The relevant inquiry is whether the claimed error of the trial court is likely to have affected the outcome of the trial. See, e.g., *State* v. *McIntyre*, 242 Conn. 318, 329, 699 A.2d 911 (1997).

In this case, the defendant has failed to show that the testimony of both detectives and both of the victim's parents was likely to have affected the outcome of the trial. First, each of these four witnesses testified only briefly on constancy of accusation, the questioning being limited to the same four leading questions. See footnote 11 of this opinion. Second, the state relied at trial substantially on the testimony of the victim and Kessler. The victim's testimony included substantial detail about the nature and circumstances of the assault. Her testimony was corroborated by the physical examination and testimony of Kessler, including the fact that the victim had suffered bruises and lacerations as a result of the sexual assault. Therefore, the evidence to which the detectives and the victim's parents testified was properly before the jury through other testimony presented at trial. The detectives and the victim's parents corroborated the testimony already presented through the victim, Kessler, and the victim's sister. As a result, the detectives' and the victim's parents' "cor-

roborative testimony was merely cumulative and was therefore harmless." *State* v. *Rogers*, 199 Conn. 453, 462, 508 A.2d 11 (1986) (corroborative testimony regarding uncharged sexual misconduct was cumulative and harmless in sexual assault trial); see also *State* v. *Randolph*, 190 Conn. 576, 589–90, 462 A.2d 1011 (1983) (not reversible error if evidence admitted " 'already properly entered the case' "); *State* v. *Jeustiniano*, 172 Conn. 275, 283, 374 A.2d 209 (1977) (same).

After a careful review of the evidence, we conclude that the admission of the overlapping constancy testimony of the detectives and the victim's parents was harmless and did not affect the outcome of the trial because the state presented substantial other evidence of the defendant's guilt. We reiterate, however, our cautionary language in *Troupe*, namely, that in admitting constancy of accusation testimony, the trial court must carefully "balance the probative value of the evidence against any prejudice to the defendant." *State* v. *Troupe*, supra, 237 Conn. 305.

## IV

The defendant next claims that the trial court improperly admitted details of the victim's complaint through the testimony of her sister and Kessler, her treating gynecologist, under exceptions to the hearsay rule, specifically, the excited utterance exception and the treating physician exception. The defendant claims that, in fact, these two witnesses were additional constancy of accusation witnesses whose testimony should have been limited to the fact and timing of a complaint in accordance with *Troupe*. We are not persuaded. Although our decision in *Troupe* restricted the constancy of accusation doctrine, we also held that *Troupe* "does not affect those cases in which the details of a sexual assault complaint are otherwise admissible

. . . ." Id., 304 n.19. The testimony of these two witnesses falls squarely within that category.

A

During the trial, the defendant filed a motion in limine seeking to limit the testimony of the victim's sister to the confines of *Troupe*. The trial court allowed the state to make an offer of proof outside the presence of the jury regarding the sister's testimony. This proffer included testimony pertaining to the events immediately following the victim's arrival home subsequent to the alleged sexual assault, as well as the victim's interactions with family members and her emotional state. The trial court denied the motion in limine.

The victim's sister testified that shortly after midnight on February 11, 1986, she heard the victim arrive home. The sister testified that she found the victim in her bedroom, in a distressed emotional state, sobbing uncontrollably. During the approximately ten to fifteen minutes that passed between the time she initially entered the victim's bedroom and when the victim ultimately disclosed the details of the assault to her, the victim remained "frightened" and "traumatized." The victim was curled up in a fetal position on the floor of her bedroom, she had trouble breathing and was unable to regain her composure throughout the ten to fifteen minutes that elapsed. Based on that testimony, the trial court admitted the testimony of the victim's sister under the excited utterance exception to the hearsay rule.

The excited utterance exception is well established. Hearsay statements, otherwise inadmissible, may be admitted into evidence to prove the truth of the matter asserted therein when (1) the declaration follows a startling occurrence, (2) the declaration refers to that occurrence, (3) the declarant observed the occurrence, and (4) the declaration is made under circumstances that negate the opportunity for deliberation and fabrica-

tion by the declarant. *State* v. *Stange*, 212 Conn. 612, 616–17, 563 A.2d 681 (1989).

"The requirement that a spontaneous utterance be made under such circumstances as to [negate] the opportunity for deliberation and fabrication by the declarant . . . does not preclude the admission of statements made after a startling occurrence as long as the statement is made under the stress of that occurrence." (Internal quotation marks omitted.) *State* v. *Guess*, 44 Conn. App. 790, 803–804, 692 A.2d 849 (1997), aff'd, 244 Conn. 761, 715 A.2d 643 (1998). "While [a] short time between the incident and the statement is important, it is not dispositive." (Internal quotation marks omitted.) Id., 804. The defendant challenges the admission of the victim's spontaneous utterance to her sister under this fourth prong of the excited utterance test.

"Whether an utterance is spontaneous and made under circumstances that would preclude contrivance and misrepresentation is a preliminary question of fact to be decided by the trial judge." *State* v. *Stange*, supra, 212 Conn. 617. "The trial court has broad discretion in making that factual determination, which will not be disturbed on appeal absent an unreasonable exercise of discretion. . . . Furthermore, although the time period between the occurrence and the utterance is important, it is not dispositive." (Citation omitted; internal quotation marks omitted.) *State* v. *Shabazz*, 246 Conn. 746, 766, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999); see also *State* v. *Chesney*, 166 Conn. 630, 638, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974).

The defendant claims that because the victim's initial reaction upon her arrival home was to lie to her father about the sexual assault, instead telling him that she

was distraught because she had argued with a friend, that indicates that she had time for reasoned reflection and that any subsequent statement could not be considered an excited utterance. The defendant also maintains that because the victim initially was reluctant in recounting the details of the assault to her sister and requested that her sister not reveal any of the information ultimately disclosed, the victim's statements could not be considered excited utterances as there was ample time to reflect and fabricate the information provided to her sister. We find this argument to be without merit.

Only a period of approximately ten to fifteen minutes passed between the startling occurrence—the sexual assault—and the victim's disclosures to her sister. The victim remained in an emotionally distressed state throughout that time period. The trial court reasonably concluded that the victim's behavior comported with that of an individual reacting to a severely emotional, startling event without the time or wherewithal to fabricate it.

B

The defendant next asserts that the trial court improperly allowed Kessler to testify to the details of the rape under the treating physician exception to the hearsay rule. We disagree.

On the day after the assault, the victim sought medical treatment from Kessler, who conducted a physical examination of the victim and took a routine history of the origin and circumstances of the condition she was seeking treatment for, namely, the sexual assault. Kessler subsequently testified to the content of her conversation with the victim, as well as to the results of her physical examination of the victim. Her testimony included statements that the victim had been forced to undress on the night of the assault, that the defendant

had choked the victim, that the victim had been forced to have sex with the defendant in the back of the Jeep, that the victim had reported heavy bleeding in her vaginal area during and subsequent to the assault, and that the defendant had worn a condom. Kessler further testified that during her physical examination of the victim, Kessler had noted bruises and lacerations on the victim's buttocks and vagina and that the victim had complained of neck and back pain.

"[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Coleman*, 241 Conn. 784, 789, 699 A.2d 91 (1997).

It is well settled that out-of-court statements made by a patient to a physician for the purposes of obtaining medical diagnosis and treatment are admissible under the treating physician exception to the hearsay rule. See, e.g., *State* v. *DePastino*, 228 Conn. 552, 565, 638 A.2d 578 (1994). "Out-of-court statements made by a patient to a physician may be admitted into evidence if the declarant was seeking medical diagnosis or treatment, and the statements are reasonably pertinent to achieving those ends." Id. "A physician, who is consulted by a patient for the purpose of obtaining from her [or him] professional medical treatment or advice incidental thereto, may testify to her [or his] opinion even though it is based, in whole or in part, on statements made . . . by the patient; and, of course, she [or he] may also testify to such statements. *Brown* v. *Blauvelt*, 152 Conn. 272, 274, 205 A.2d 773 (1964)." (Internal quotation marks omitted.) *State* v. *Wood*, 208 Conn. 125, 134, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988).

The defendant cites this court's decision in *State* v. *DePastino*, supra, 228 Conn. 552, to support the proposition that the treating physician exception to the hearsay rule in sexual assault cases is extremely narrow, and applies only when the victim is a child and when the sexual abuse occurs in the home. Such an assertion misconstrues our holding in that case. In *DePastino*, we noted that "[s]tatements concerning the cause of the injury or the identity of the person who caused the injury usually are not relevant to treatment and, therefore, are not admissible under the medical diagnosis and treatment exception to the hearsay rule." Id., 565, citing *State* v. *Dollinger*, 20 Conn. App. 530, 534, 568 A.2d 1058, cert. denied, 215 Conn. 805, 574 A.2d 220 (1990). In *DePastino*, we concluded that testimony pertaining to the identity of the defendant and the nature of the sexual assault were wholly relevant and pertinent to proper diagnosis and treatment of the resulting physical and psychological injuries of sexual assault. *State* v. *DePastino*, supra, 565. While *DePastino* involved sexual abuse of a child in the home, we did not limit the treating physician exception to the narrow confines that the defendant in the present case now articulates.

The defendant inaccurately asserts that *DePastino* stands for the proposition that only the physicians of child-victims of in home sexual abuse may testify to the identity of the perpetrator of the sexual violence and the details of such complaints. In any sexual assault, the identity of the perpetrator undoubtedly is relevant to the physician "to facilitate the treatment of psychological and physical injuries." (Internal quotation marks omitted.) Id. Thus, we conclude that the trial court did not abuse its discretion and properly admitted Kessler's statements under the treating physician exception.

## V

The defendant next contends that the trial court's refusal to dismiss the information or, alternatively, to exclude witness Thomas Kelly's[14] testimony based on the state's reimbursement of him for lost wages, violated the defendant's constitutional due process rights. We disagree.

The following additional facts are necessary to the resolution of this issue. During the defendant's first trial in this case, which ended in a mistrial in November of 1996, Thomas Kelly, a friend of the defendant's who was with him on the night of the sexual assault, testified on behalf of the state. Subsequently, on January 6, 1997, Thomas Kelly submitted a letter from his employer to the state, seeking reimbursement for lost wages. The letter set forth the wages that he had lost by attending court in October, 1996. As a result of this request for reimbursement, the state paid Thomas Kelly $150 for his lost wages, in accordance with the state's practice of reimbursing its witnesses for routine expenses incurred by attending court proceedings.

On May 19, 1997, during the second trial, the defendant filed a motion for *Brady*[15] material, which was granted by the trial court. This *Brady* request specifically requested information about any payments made to Thomas Kelly. In response to the defendant's motion, the state disclosed that it had reimbursed Thomas Kelly $150 for lost wages and that an author writing a book about the case had paid Thomas Kelly $1000 for his story.

Subsequently, the defendant filed a motion to dismiss the information or, alternatively, to exclude Thomas

---

[14] Thomas Kelly is not related to the defendant.

[15] *Brady* v. *Maryland*, 373 U.S. 83, 86–88, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (holding that prosecution's suppression of evidence that is favorable to defense violates due process where evidence is material either to guilt or to punishment, irrespective of good or bad faith of prosecutor).

Kelly's testimony, and requested an evidentiary hearing. The trial court heard arguments on the motion and denied the defendant's request for an evidentiary hearing. The trial court then denied the defendant's motion to dismiss the information or, alternatively, to exclude Thomas Kelly's testimony. The trial court determined that the state's failure to disclose its reimbursement to Thomas Kelly until May 19, 1997, did not violate *Brady* because it had provided the information before Thomas Kelly testified in the second trial. The trial court further found that any impropriety could be remedied by cross-examination about this information. In addition, the trial court found that Connecticut case law was unclear as to whether it was lawful for the state to reimburse witnesses. Despite the uncertainty about the law, however, the trial court concluded that because the reimbursement was relevant only to the witness' credibility at trial, the defendant's claim could be resolved by the disclosure of the reimbursement to the jury and by the defense's cross-examination of Thomas Kelly on the issue.

On May 20, 1997, Thomas Kelly testified that, on the day after the sexual assault, he had asked the defendant if the defendant and the victim had been intimate the night before. Thomas Kelly further testified that the defendant had told him that he had not been intimate with the victim and that before the defendant and the victim had gotten into the Jeep, the victim accepted a ride home from some of her friends who had pulled up in a station wagon.

The defendant contends that the trial court violated his due process rights by allowing Thomas Kelly to testify and by not dismissing the information when the state's $150 reimbursement to Thomas Kelly was uncovered. The defendant asks this court either to dismiss the information or to remand the case for a new trial

at which Thomas Kelly would be prohibited from testifying.

### A

The defendant first asserts that the state's reimbursement to Thomas Kelly violated General Statutes (Rev. to 1995) § 52-260 (a),[16] which provides in relevant part: "In criminal trials, no fees may be allowed to bystanders called as witnesses." We agree.

Black's Law Dictionary (6th Ed. 1990) defines a bystander as "[o]ne present but not taking part, looker-on, spectator, beholder, observer." In this case, Thomas Kelly testified to observations made of the defendant and to conversations he had with the defendant on the day after the assault. Thus, we conclude that Thomas Kelly fits squarely within the plain meaning definition of a bystander witness. As such, any reimbursement to him falls within the prohibition of § 52-260 (a). We therefore agree with the defendant that the $150 reimbursement to Thomas Kelly violated state law. We find, however, that this impropriety was harmless.

---

[16] Because the reimbursement to Thomas Kelly at issue here was for his appearance at the defendant's 1996 trial, we refer herein to the 1995 revision of § 52-260 (a), which was in effect at that time. We acknowledge that a subsequent change to subsection (a), which is not applicable here, occurred in 2000. See Public Acts 2000, No. 00-45.

The state contends that an alternative statutory basis for the payment to Thomas Kelly is provided by General Statutes § 51-279 (b), which provides in relevant part: "[E]xpenses of prosecution, including payment of witness fees of policemen and other witnesses summoned by the prosecution . . . shall be paid from the budget of the division [of criminal justice]. . . ." We are unpersuaded. The statute, on its face, implicates fees associated with calling law enforcement officers as witnesses in a criminal matter. We disagree with the state's interpretation of § 51-279 (b), that the statute additionally authorizes the chief state's attorney to reimburse bystander witnesses under this provision at his discretion. Section 52-260 (a) clearly contraindicates the state's interpretation of § 51-279 (b) and evidences that the legislature's intention was not to compensate bystander witnesses in criminal matters.

Although the defendant contends that the improper reimbursement to Thomas Kelly violated his constitutional due process rights, we do not agree. "Due process is not to be regarded as a giant constitutional vacuum cleaner which sucks up any claims of error which may occur to a party upon microscopic examination of the trial record." *State* v. *Kurvin*, 186 Conn. 555, 564, 442 A.2d 1327 (1982). "Indeed, it would trivialize the constitution to transmute a nonconstitutional claim into a constitutional claim simply because of the label placed on it by a party . . . ." (Internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 817, 709 A.2d 522 (1998).

The crux of the defendant's argument is that Thomas Kelly's testimony was biased and had been improperly influenced by the state's reimbursement to him for lost wages. This is nothing more than an issue of witness credibility to be determined by the trier of fact. To prevail on this issue, the defendant must show that it was more probable than not that the error affected the outcome of the trial. See, e.g., *State* v. *McIntyre*, supra, 242 Conn. 329. We conclude that the remedy of cross-examination afforded by the trial court was adequate to cure the improper reimbursement to Thomas Kelly and that the defendant has failed to show the requisite degree of harm to merit a new trial.

The question of the appropriate remedy when a bystander witness is paid to testify in a criminal case is one of first impression for this court. In the other jurisdictions that have dealt with the issue of the appropriate remedy for situations in which a witness was paid a fee in excess of that which was statutorily authorized, courts have held consistently that although such a fee agreement is unenforceable, the unenforceability does not require the verdict to be overturned. *Smith* v. *Allen*, 212 F. Sup. 713, 714 (E.D. Va. 1962); *Slayton* v. *Weinberger*, 213 Va. 690, 693–94, 194 S.E.2d 706 (1973). These

courts have held that the existence of a contract to pay a witness a fee goes to the credibility of the witness and a proper remedy is disclosure to the jury and the ability to cross-examine regarding the contract. *Jamaica Time Petroleum, Inc.* v. *Federal Ins. Co.*, 366 F.2d 156, 158 (10th Cir. 1966), cert. denied, 385 U.S. 1024, 87 S. Ct. 753, 17 L. Ed. 2d 674 (1967) (holding that witness who was paid fee to testify was competent because issue of payment went only to witness' credibility); *Slayton* v. *Weinberger*, supra, 693–94. We are persuaded by this reasoning.

In the present case, we conclude that the state's $150 reimbursement to Thomas Kelly should not nullify the defendant's conviction. The trial court provided the defendant with the appropriate remedy of cross-examination of the witness. The defendant was made aware of the state's reimbursement to Thomas Kelly prior to his testimony, and the reimbursement was disclosed to the jury and was the focus of extensive cross-examination. Thus, we conclude that the trial court's remedy was sufficient to cure any possible prejudice created by the state's violation of § 52-260 (a).

B

The defendant next argues that the state's reimbursement to Thomas Kelly constituted prosecutorial misconduct. We are not persuaded.

In considering an allegation of prosecutorial misconduct, the court must consider "the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). In order to prevail on a claim of prosecutorial miscon-

duct, the defendant bears the burden of identifying the alleged misconduct and demonstrating that it was prejudicial and deprived him of a fair trial. *State* v. *Ubaldi*, 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). The defendant has failed to meet his burden.

As aforementioned, the trial court's curative measures were adequate and permitted disclosure of the reimbursement to the jury and cross-examination of Thomas Kelly by the defense. Further, the state's case was not based on Thomas Kelly's testimony, but, rather, on the strength of the victim's testimony and the corroborating physical evidence.

For the foregoing reasons, we do not find that the defendant's trial was so infected with unfairness as to make his conviction a denial of due process when the trial court's remedy of disclosure and cross-examination about the reimbursement of Thomas Kelly for lost wages was sufficient to cure any prejudice created by the reimbursement. See *Darden* v. *Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986).

VI

The defendant next claims that the trial court improperly: (1) denied his motion in limine to preclude the state from offering any evidence of his flight from the country prior to the scheduled start of his first trial in 1987; and (2) instructed the jury that it could consider evidence of the defendant's flight as proof of his consciousness of guilt. We disagree with both claims.

Certain additional facts are necessary to the resolution of this issue. Prior to the start of trial, the defendant filed a motion in limine in which he requested that the trial court preclude the state from offering any evidence of his flight from the country and subsequent eight year sojourn through various foreign countries. In a twenty-

three page memorandum of decision, the trial court denied the defendant's motion, but ordered that the evidence that the state would be permitted to present in its case-in-chief would be limited to proof of the defendant's failure to appear for trial on February 18, 1987. The trial court further ordered that "[o]nce the defendant offers evidence as to the reasons for the flight, the state will be permitted, on rebuttal, to offer evidence as to the length of the flight and the circumstances [of the flight]."

During its case-in-chief, the state called Helen Kalmanides, a deputy court clerk. Kalmanides testified that jury selection for the defendant's trial had been scheduled to begin on February 18, 1987, but that when the defendant failed to appear in court, his bond was forfeited, and his rearrest was ordered. During his case, the defendant called Michael Sherman, the attorney who had represented him in 1987. Sherman testified that he had told the defendant shortly before the trial was to have started, that he "was deeply concerned that [the defendant] was not getting a fair shake from the criminal justice system here in Connecticut . . . ."

On rebuttal, the state called James Larner, a senior forensic document examiner for the United States Immigration and Naturalization Service. Based on the various stamps and franks on the defendant's passport, Larner testified as to the various foreign countries to which the defendant had traveled after he left the United States in February, 1987. The state also called Detective Bussell, who testified about the 1987 police search for the defendant, and the circumstances surrounding the defendant's surrender in 1995.

At the close of the trial, the trial court instructed the jury on the legal basis for flight as evidence of consciousness of guilt, and on the standard by which the jury should evaluate the particular evidence presented

during the trial.[17] The defendant did not object to this part of the trial court's charge, either in his written objections to the trial court's draft instructions, or at the charging conference, nor did he take exception after the charge was given.

## A

We consider first the defendant's contention that the trial court improperly denied his motion in limine. "As a threshold matter, we set forth the standard by which this court reviews a challenge to a trial court's [evidentiary ruling]. The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . *State* v. *Berger*, 249 Conn. 218, 229, 733 A.2d 156 (1999)." (Internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 326, 746 A.2d 761 (2000). We conclude that the trial court in the present case did not abuse its discretion by denying the defendant's motion in limine.

---

[17] The trial court instructed the jury that "[f]light, when not explained, may indicate consciousness of guilt if the facts and circumstances support it. On the other hand, you may consider any explanation offered on behalf of the defendant to explain his flight. There could be other reasons for flight. Flight does not necessarily reflect feelings of guilt. However, flight if shown is not conclusive nor does it raise a legal presumption of guilt but is to be given the weight [to] which the jury thinks it is entitled under the circumstances shown."

After summarizing the evidence of flight presented by both the state and the defendant, the trial court further instructed the jury that "[y]ou may consider and weigh this evidence about the accused in connection with all the other evidence of the case and give it such weight as in your sound judgment it is fairly entitled to receive. You may make a permissible inference of consciousness of guilt from the defendant's conduct and you are equally free to determine that the defendant's conduct does not warrant an inference of consciousness of guilt. That is for you to decide."

It is a well settled evidentiary principle that "[f]light, when unexplained, tends to prove a consciousness of guilt . . . . Flight is a form of circumstantial evidence. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration. . . . *State* v. *Holloway*, 209 Conn. 636, 651–52, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989)." (Internal quotation marks omitted.) *State* v. *Freeney*, 228 Conn. 582, 593–94, 637 A.2d 1088 (1994). "The probative value of flight as evidence of a defendant's guilt depends on the degree of confidence with which four inferences can be drawn: (1) from behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *United States* v. *Levine*, 5 F.3d 1100, 1107 (7th Cir. 1993).

The evidence offered by the state in this case certainly satisfies that standard for admissibility, and would have permitted the jury to make the necessary logical inferences. As we repeatedly have stated, "[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence *tend to* support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . *State* v. *Coleman*, [supra, 241 Conn. 788–89]." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 257, 745 A.2d 800 (2000).

Because the jury in this case reasonably could have inferred that a guilty conscience had motivated the defendant's 1987 flight from the country, the evidence was relevant on that subject, and hence, admissible. That there may have been other possible explanations for the defendant's flight goes only to the *weight* of the evidence presented by the state, and not its admissibility. See *State* v. *Wright*, 198 Conn. 273, 281, 502 A.2d 911 (1986) (" '[t]he probative value of evidence of flight depends upon all the facts and circumstances and is a question of fact for the jury' ").

The defendant advances two principal arguments in support of his contention that the trial court improperly denied his motion in limine. We find neither of these arguments persuasive.

First, the defendant contends that because "[he] left the United States almost one year after the alleged incident occurred, [his flight] did not logically show that the defendant had fled due to a consciousness of guilt." According to the defendant, flight is probative of an individual's guilty conscience only when that flight occurs immediately after the alleged criminal conduct.

Contrary to the defendant's argument, however, a number of courts have held that "evidence of flight that occurs in close temporal proximity to other significant events in the course of a prosecution (such as the commencement of trial) also may be probative of the defendant's guilt." *United States* v. *Lacey*, 86 F.3d 956, 973 (10th Cir.), cert. denied, 519 U.S. 944, 117 S. Ct. 331, 136 L. Ed. 2d 244 (1996); see also *United States* v. *Levine*, supra, 5 F.3d 1108 (defendant who fled one year after crime "had no reason to flee until he realized that he might face criminal sanctions for the murders"); *United States* v. *Dillon*, 870 F.2d 1125, 1128 (6th Cir. 1989) ("the mental crisis that precipitates flight may fail to occur immediately after the crime, only to erupt

much later, when the defendant learns that he or she is charged with the crime and sought for it"); *Harold v. State*, 579 So. 2d 908, 909 (Fla. App. 1991) ("[i]t is readily apparent that a defendant's abrupt departure from the courthouse after jury selection indicates a desire to avoid prosecution").

In this case, the defendant's flight clearly occurred in "close temporal proximity to other significant events in the course of [his] prosecution"; *United States v. Lacey*, supra, 86 F.3d 973; namely, his trial. It is conceivable, of course, that the defendant's departure had been motivated by some factor other than a guilty conscience. Such ambiguity, however, even when coupled with the time lapse between the offense and the flight, is a circumstance that properly is left for the jury to weigh, and does not constitute a valid reason for precluding the evidence from being presented at trial.

Second, the defendant argues that because "[a]t the time [he] fled the country, he was scheduled to begin trial on two separate charges of rape . . . [i]t was never proven which event, if either, caused the defendant to flee." Although we never have addressed this precise issue, an identical claim has been considered, and rejected, by the Appellate Court on three separate occasions. See *State v. Fuller*, 48 Conn. App. 374, 382, 709 A.2d 1142 (1998); *State v. Williams*, 27 Conn. App. 654, 664, 610 A.2d 672, cert. denied, 223 Conn. 914, 614 A.2d 829 (1992); *State v. Briggs*, 17 Conn. App. 648, 656–57, 554 A.2d 1112, cert. denied, 211 Conn. 802, 559 A.2d 1137 (1989). The defendant's argument also has been rejected by a number of courts from other jurisdictions. See, e.g., *People v. Neiman*, 90 Ill. App. 2d 337, 346, 232 N.E.2d 805 (1967) (rule excluding flight evidence due to existence of other charges "would reward the professional criminal and punish the neophyte"); *State v. Brown*, 735 S.W.2d 152, 153 (Mo. App. 1987) (existence of other charges does not render evidence

of flight inadmissible); *Langhorne* v. *Commonwealth*, 13 Va. App. 97, 103, 409 S.E.2d 476 (1991) ("[defendant] cannot avoid the inferences which the fact finder may draw from his [flight] because other charges were pending against him and he may also have been evading those charges").

As the Supreme Court of Georgia has noted, requiring the state to prove *which* crime caused a defendant to flee "would place upon the State an impossible burden to prove that one charged with multiple violations of the law fled solely because of his consciousness that he committed one particular crime. *It is better logic to infer that the defendant, who is charged with several offenses, fled because of a conscious knowledge that he is guilty of them all.*" (Emphasis added.) *Fulford* v. *State*, 221 Ga. 257, 258, 144 S.E.2d 370 (1965). Faced with a defendant who flees under the cloud of multiple charges, once again it is the province of the jury to sort through any ambiguity in the evidence in order to determine whether the defendant's flight warrants the inference that he possessed a guilty conscience. As that was the case here, we choose not to intrude into that fact-sensitive determination.

In sum, although we agree with the defendant's assertion that flight evidence "is a species of evidence that . . . should not be admitted mechanically"; *United States* v. *Hernandez-Bermudez*, 857 F.2d 50, 54 (1st Cir. 1988); nothing in the record leads us to conclude that the trial court acted in such a manner here. To the contrary, the trial court carefully considered all of the issues surrounding the admission of this evidence in a lengthy memorandum of decision. Nothing about the evidence itself, nor any of the defendant's various legal claims, leads us to conclude that the trial court's decision denying the defendant's motion in limine to preclude the state from offering any flight evidence

constituted an abuse of the court's wide discretion in evidentiary matters.

## B

We turn next to the defendant's claim that the trial court improperly instructed the jury on flight as evidence of consciousness of guilt. Although the defendant now claims that the trial court's instruction on flight as evidence of consciousness of guilt was improper, he did not object to the charge at trial, either in his written objections to the trial court's draft jury instructions or at the charging conference. Nor did he take exception after the charge was given. We therefore decline to review the defendant's unpreserved claim.[18] See *State v. Tillman*, 220 Conn. 487, 503–504, 600 A.2d 738 (1991), cert. denied, 505 U.S. 1207, 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992); *State v. Holloway*, supra, 209 Conn. 652.

## VII

The defendant's next claim is that the trial court improperly excluded as hearsay a statement that the

---

[18] The defendant concedes, in his reply brief, that he did not seek review of this claim under *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), but asks us to review the issue under the plain error doctrine. See Practice Book § 60-5. "We repeatedly have observed that plain error is not even implicated unless the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. *State v. Boles*, 223 Conn. 535, 551, 613 A.2d 770 (1992)." (Internal quotation marks omitted.) *State v. Cassidy*, 236 Conn. 112, 144, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), overruled on other grounds, *State v. Alexander*, 254 Conn. 290, 755 A.2d 868 (2000). Although, on rare occasions, we have granted plain error review for claims of improper jury instructions; see, e.g., *State v. Preyer*, 198 Conn. 190, 199, 502 A.2d 858 (1985) (failure to charge on General Statutes § 53a-67 [b], which provides affirmative defense of cohabitation to sexual assault charge); *State v. Burke*, 182 Conn. 330, 331–32, 438 A.2d 93 (1980) (failure to charge on General Statutes § 54-84, which requires instruction that jury may draw no adverse inference from defendant's failure to testify); we have done so only when the instruction in question either failed to include language from a mandatory charging statute, or when the instruction was so patently improper that to allow it to stand uncorrected would work a manifest injustice. The challenged instruction in this case falls into neither of those two categories.

defendant had made to his father on the night of the assault. Specifically, the defendant argues that his statement was admissible under the excited utterance exception to the hearsay rule, as he made this statement after being awakened from a sound sleep and confronted with an accusation that he had sexually assaulted the victim. The defendant contends that the trial court's exclusion of this statement denied him the right to present a defense and the right to a fair trial. We disagree.[19]

The following additional facts are necessary to the resolution of this claim. The state filed a motion in limine requesting that the court exclude testimony by Joseph Kelly, the defendant's father, as to a statement made to him by the defendant. The state argued, in its motion in limine, that the defendant's statement was inadmissible hearsay. In response to the state's motion in limine, the defendant argued that this statement was admissible under the excited utterance exception to the hearsay rule, as it was made after the defendant was startled awake from a sound sleep and confronted with the victim's sexual assault allegations.

The defendant proffered the following evidence. At approximately 1:30 a.m. on February 11, 1986, the defendant's father received a telephone call from the victim's father. During this telephone conversation, the victim's father told Joseph Kelly that Kelly's son had just sexually assaulted the caller's daughter. Immediately after this telephone conversation, Joseph Kelly went into the defendant's bedroom and shook him awake. Joseph Kelly then told his son that the victim's father had called, claiming that the defendant had sexually assaulted his

---

[19] The defendant contends that the trial court's exclusion of this statement denied him the constitutional right to present a defense and the right to a fair trial. We disagree. Evidentiary matters are generally not constitutional in nature and will be overturned only upon a showing of abuse of discretion. See, e.g., *State* v. *Coleman,* supra, 241 Conn. 789. Thus, we review the claim under an abuse of discretion standard.

daughter. The defendant then allegedly responded, "Dad, I didn't rape his daughter . . . we had sex."

The trial court granted the state's motion in limine to exclude the testimony of Joseph Kelly regarding the defendant's statement to him on the night of the assault, because it found that this statement constituted inadmissible hearsay. Subsequently, the trial court also denied the defendant's motion for reconsideration. Specifically, the trial court found that the sexual assault was the startling occurrence and the time that had passed between the assault and the defendant's statement to his father was sufficient to give the defendant an opportunity to fabricate the statement. In addition, the trial court held that even if the startling occurrence had been the defendant's father awakening the defendant from a sound sleep and confronting him with the accusation, the totality of the circumstances—especially that it was a self-serving denial—strongly suggested that the defendant's statement was unreliable and inadmissible.

The excited utterance exception to the hearsay rule is well established. See part IV A of this opinion. "The ultimate question is whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation." (Internal quotation marks omitted.) *State* v. *Dollinger*, supra, 20 Conn. App. 537. While the amount of time that passes between a startling occurrence and a statement in question is not dispositive, the court is "entitled to take all the factual circumstances into account when deciding the preliminary question of whether a statement was spontaneous." (Internal quotation marks omitted.) *State* v. *Shabazz*, supra, 246 Conn. 766–67 (statements to police officer at crime scene that defendant "was defending himself" and that victim " 'started it' " did not constitute excited utterances when they were exculpatory and made to police officer after defendant was aware that

officer saw part of incident). The appropriate question is whether the statements were made "before reasoned reflection had taken place." (Internal quotation marks omitted.) *State* v. *Dollinger*, supra, 538.

In the present case, the trial court properly determined that, under the totality of the circumstances, the defendant's statement was not spontaneous, but was made with ample time for " 'reasoned reflection . . . .' " Id. More than one and one-half hours had passed between the time of the sexual assault and the defendant's statement to his father. During this time, the defendant had dropped the victim off at her home, gone to his own home, and gone to bed. The defendant argues that he did not have the opportunity to fabricate a story because he went home and immediately went to sleep. The defendant presented, however, no evidence to that effect. The defendant has not met his burden of proving that he did not have an opportunity to think about and fabricate a story that night after the assault. See *State* v. *Bowman*, 46 Conn. App. 131, 141, 698 A.2d 908 (1997) (holding that victim's statements were not spontaneous because she "had ample time to collect her thoughts").

The defendant also argues that the startling occurrence was not the sexual assault, but was the act of being awakened by his father and confronted with an accusation. The excited utterance exception requires, however, that the statement not only immediately follow a startling event, but that it must also relate to that startling occurrence. *State* v. *Stange*, supra, 212 Conn. 616–17. Even if being awakened by his father was startling to the defendant, the defendant's statement did not relate to being awakened, but to the sexual assault that had occurred more than one and one-half hours earlier. Under the defendant's reasoning, any statements made by a defendant denying an accusation of criminal activity could qualify as an excited utterance

and be offered for the truth of the matter asserted therein, namely, that the accused did not commit the offense. This would contravene the excited utterance exception, the purpose of which is to admit inherently trustworthy statements made in response to a shocking event. *State* v. *McNair*, 54 Conn. App. 807, 810, 738 A.2d 689, cert. denied, 251 Conn. 913, 739 A.2d 1249 (1999) ("[t]he excited utterance exception rests on the view that such assertions, made in reaction to a startling event, are trustworthy and void of self-interest" [internal quotation marks omitted]). In light of the totality of the circumstances the trial court properly determined that in the present case, the defendant's self-serving exculpatory statement was not an excited utterance and therefore the trial court properly excluded the defendant's father's testimony regarding that statement.

## VIII

The defendant next claims that the trial court improperly admitted into evidence portions of a videotape concerning a motor vehicle similar to the one in which the sexual assault here occurred. Specifically, the defendant claims that the trial court abused its discretion in admitting segments two, five, six, eight, fourteen, fifteen and seventeen of the videotape because they were distorted, irrelevant and prejudicial. We disagree.

### A

Additional facts are necessary to the resolution of this issue. In March, 1997, the state informed the defendant of its intention to introduce at trial a videotaped demonstration of the interior of a 1983 Jeep Wagoneer. On March 17, 1997, the state provided a copy of the videotape to the defense. Subsequently, the defendant filed a motion in limine to exclude the videotape. As grounds for his motion in limine, the defendant argued that the videotape did not represent accurately the events as testified to by the victim, that the videotape

was immaterial and irrelevant, and that the videotape was unduly prejudicial.

After viewing the videotape outside the presence of the jury, the trial court granted the defendant's motion in limine on the ground that the videotape was highly prejudicial. The trial court noted, however, that showing a videotape seemed to be a more reasonable alternative than offering an actual Jeep Wagoneer into evidence.[20] Therefore, the trial court suggested that the state revise the videotape. The trial court stated: "I would suggest that your future video contain an interior demonstration of the car and that there be some ability to demonstrate that the individuals involved are the same height and weight [as the victim and the defendant]." In addition, the trial court commented that under its reading of the case law, the videotape could demonstrate "someone trying to move the seat back and forth and do a demonstration with the seats . . . ." The defendant objected to these suggestions, stating that the trial court improperly was attempting to aid the state. In response to the defendant's objection, the trial court stated that the defendant had agreed to the admission of a different demonstrative videotape at the previous trial and that the time necessary to make revisions to the state's videotape would not unduly delay the trial.

The state then revised the videotape. Subsequently, the defendant filed a second motion in limine objecting to certain segments of the revised videotape. After reviewing the revised videotape and hearing the arguments on the motion in limine, the trial court excluded segments seven, nine, ten, twelve and thirteen of the videotape. In addition, the trial court ordered that segments fifteen and sixteen of the videotape be further

---

[20] The state had proposed to offer an actual 1983 Jeep Wagoneer into evidence for the purpose of having a witness demonstrate the use of the seat mechanism.

edited to respond to the defendant's objections as to the position of the head of the woman in the demonstration.[21] The state then played the revised and edited videotape for the jury, as a detective from the Darien police department explained each segment to the jury.

B

The defendant contends that the admission into evidence of segments two, five, six, eight, fourteen, fifteen and seventeen[22] of the state's videotape constituted an abuse of discretion by the trial court. We disagree.

This court consistently has held that the trial court's determination on the admissibility of photographic evidence, including videotapes, "will not be disturbed unless the trial court has abused its discretion." *State v. Williams*, 227 Conn. 101, 111, 629 A.2d 402 (1993); *State v. DeJesus*, 194 Conn. 376, 382, 481 A.2d 1277 (1984); *State v. Piskorski*, supra, 177 Conn. 701.

This court also has held that photographic evidence is admissible where the photograph has a "reasonable tendency to prove or disprove a material fact in issue or shed some light upon some material inquiry." (Internal quotation marks omitted.) *State v. DeJesus*, supra, 194 Conn. 381; *State v. Williams*, supra, 227 Conn. 111. Therefore, it is not necessary to show that the photo-

---

[21] Segment sixteen of the videotape was deleted entirely during the state's editing process and was, therefore, never seen by the jury.

[22] Segment two contained a view of the vehicle with the rear cargo door open. Segment five showed a woman and a man standing together outside of the vehicle. Segment six depicted a woman sitting in the front passenger seat, operating the electric lever that moves the seat forward and back. Segment eight showed a man operating the rear latch of the vehicle with one hand, making the rear seat go down. Segment fourteen depicted a man lowering the backseat from the front passenger seat. Segment fifteen demonstrated a woman moving from the front passenger seat to the rear of the vehicle. Segment seventeen showed a man who crouched in the rear cargo area, turned and flipped the backseat up to rest against the front seat, exited the vehicle through the rear cargo door and moved the vehicle up and down by pushing on the rear tailgate.

graphic evidence is essential to the case in order for it to be admissible. *State* v. *Williams*, supra, 111; *State* v. *DeJesus*, supra, 381; *State* v. *Piskorski*, supra, 177 Conn. 701–702. In determining whether photographic evidence is admissible, the appropriate test is relevancy, not necessity. *State* v. *Williams*, supra, 111; *State* v. *Doehrer*, 200 Conn. 642, 649, 513 A.2d 58 (1986); *State* v. *Haskins*, 188 Conn. 432, 453, 450 A.2d 828 (1982); *State* v. *Piskorski*, supra, 701.

In addition, this court consistently has stated that even potentially inflammatory photographic evidence may be admitted if, in its discretion, the trial court determines that the probative value of the evidence outweighs its prejudicial effect. *State* v. *Doehrer*, supra, 200 Conn. 649; *State* v. *DeJesus*, supra, 194 Conn. 381; *State* v. *Haskins*, supra, 188 Conn. 452–53.

1

In the present case, after viewing the revised videotape, the trial court, in its discretion, determined that the probative value of segments one, two, three, four, five, six, eight, ten, eleven, fourteen and seventeen outweighed any prejudicial effect and therefore, admitted those segments. In addition, the trial court determined that, once edited to cure the defendant's objections to the position of the woman's head, segments fifteen and sixteen also would be probative and admissible.[23]

The trial court did not abuse its discretion in determining that the videotape was relevant and admissible in that it had a reasonable tendency to "shed some light upon some material inquiry." *State* v. *DeJesus*, supra, 194 Conn. 381. As the state argued at trial, and we agree, the videotape showing the interior configuration and mechanical operation of the Jeep aided the jury in determining whether the actions of the defendant and

---

[23] See footnote 21 of this opinion.

the victim on the night of February 10, 1986, as described by the victim, were physically and mechanically possible.

### 2

The defendant also urges us to determine that the trial court abused its discretion in admitting segments two, five, six, fourteen and seventeen of the videotape because they depict scenarios that were not testified to at trial. This argument is unavailing.

### a

Specifically, the defendant objects to segment two because it depicted the vehicle with the rear cargo door open, despite the fact that there was no testimony at trial that the door was open. The defendant argues that segment two therefore was misleading to the jury. The state argues, however, that the door was shown open in the videotape to represent a "fully lighted and accurate view" of the interior of the Jeep. At trial, the state indicated that it would not object to a limiting instruction regarding the open tailgate. The defendant, however, did not request a limiting instruction on this or any other segment of the videotape. In addition, the jury was able to view the actual Jeep during the defendant's case-in-chief and watched as the distance from the folded backseat to the closed tailgate was measured.

### b

The defendant also objected to segment five of the videotape, which showed a man and a woman standing outside the vehicle. The defendant contended that this segment was inadmissible because there was no testimony that the defendant and the victim ever stood together outside of the vehicle. The state's videotape was, however, a demonstration and not a reenactment of the events. Therefore, it is not necessary that each segment reflect a portion of the testimony given. Seg-

ment five was the state's attempt to portray the relative size of the defendant and the victim.

c

Similarly, the defendant claims that segment six was an unfair and inaccurate representation of the facts as they were testified to at trial. Segment six showed a woman sitting in the front passenger seat operating the electric lever to move the seat forward and back. The state offered this segment to show how the seat could be adjusted, because the videotape contained images of the seat both in the forward and backward positions.

The defendant's argument with regard to segment fourteen is similar in that he objected to the demonstration of the man "quickly" lowering the backseat from the front passenger seat because there was no testimony at trial as to how long it took to lower the backseat. As the state argued, however, this segment was not intended to be a literal reenactment of the assault, but, rather, a demonstration of the workings of the vehicle's seat mechanism to show that the victim's account of the defendant's actions in lowering the seat and dragging her into the rear cargo area was physically and mechanically possible.

d

The defendant further contends that the trial court improperly admitted segments fifteen and sixteen,[24] which depicted a woman moving from the front passenger seat of the vehicle to the rear of the vehicle because it represented a "staged [version] of the state's version of events . . . ." Because, however, segment fifteen shows the woman moving "under her own power" from the front seat, between the seats, and into the cargo area, the trial court reasonably concluded that the jury was not likely to infer that this demonstration, depicting

---

[24] See footnote 21 of this opinion.

only one person, was an actual reenactment of the events testified to by the victim.

e

Segment seventeen of the videotape depicted a man crouching in the rear cargo area who turned, flipped the backseat up to rest against the front seat, and then exited the vehicle through the rear cargo door and moved the car up and down by pushing on the rear cargo area. The defendant contends that this segment should have been excluded by the trial court because there had been no trial testimony that any of these events had occurred as depicted. The state claims, however, that it offered this segment to rebut the inference raised during cross-examination regarding the limited size of the cargo area.

Even if we were to assume that segment seventeen was distorted in its depiction of a man moving the Jeep up and down, any prejudice created by this was cured by the trial court's limiting instruction to the jury. The trial court twice instructed the jury to disregard the portion of the videotape in which the officer performed a demonstration that "move[d] the car in an up and down fashion." This jury instruction was given both immediately after the videotape was viewed and during the trial court's charge at the close of the evidence. Therefore, the trial court did not abuse its discretion in determining that the probative value of segment seventeen outweighed any prejudicial effect and the trial court's limited instruction assured that any prejudicial effect of segment seventeen was cured.

f

The defendant objects to segment eight on the ground that it was misleading because of its depiction of a man operating the rear latch of the vehicle that makes the rear seat go down without showing the use of a second

hand to accomplish this task. The trial court found that the videotape, in its entirety, provided "clearly sufficient information for the argument to be made . . . that a second hand is necessary" to lower the rear seat.

Once again, the state's videotape was not intended as a reenactment of the events that occurred on February 10, 1986. Rather, the state prepared and introduced this videotape as a demonstration that would aid the jury in determining whether the events, as described by the victim, could have occurred. The appropriate question for determining the admissibility of a demonstration is whether it will "fairly assist the jury in understanding the factual issues placed before them," not whether every aspect of the demonstration is a pictorial representation of testimony. *Rullo* v. *General Motors Corp.*, 208 Conn. 74, 81, 543 A.2d 279 (1988); see *Szeliga* v. *General Motors Corp.*, 728 F.2d 566, 567 (1st Cir. 1984); *Blanchard* v. *Bridgeport*, 190 Conn. 798, 806, 463 A.2d 553 (1983); *Katsetos* v. *Nolan*, 170 Conn. 637, 649, 368 A.2d 172 (1976). We conclude that the trial court did not abuse its discretion in determining that a videotape demonstrating the interior of the Jeep and the workings of the seat mechanism would be helpful to the jury in deciding whether the facts that the victim testified to physically were possible.

g

The defendant further argues that it was an abuse of discretion for the trial court to admit the challenged segments of the videotape because they distorted the facts. Although it may be true that there were some dissimilarities between the facts in evidence and the demonstration on the videotape, the videotape was not purported to be a reenactment of the events, but a demonstration of the interior of the Jeep. Therefore, any "[d]issimilarities between experimental and actual conditions affect the weight of the evidence, not its

admissibility." (Internal quotation marks omitted.) *Rullo* v. *General Motors Corp.*, supra, 208 Conn. 81–82 (noting that in considering dissimilarities, it is relevant whether videotape is reenactment or mere demonstration); see also *State* v. *Williams*, supra, 227 Conn. 111–12 (holding that admission of videotape of crime scene where victim's body was moved prior to videotaping was not abuse of discretion and dissimilarities went to weight given to videotape by jury, not to its admissibility). Therefore, any dissimilarities between the videotape in the present case and the facts as presented by testimony went to the weight the jury should give to the videotape, not to its admissibility.

h

Finally, the defendant claims that the trial court's suggestion as to the proper contents of the revised videotape are another ground on which the videotape should have been excluded. The defendant argues that in making these suggestions, the trial court became an advocate for the state and that "[o]nce a judge becomes an advocate for one of the parties in a lawsuit, grounds for disqualification as a judge exist because of the common-law maxim that no one shall be [a] judge in his own cause." (Internal quotation marks omitted.) *Swenson* v. *Dittner*, 183 Conn. 289, 297, 439 A.2d 334 (1981). Although it is true that "a judge taking an apparent position of advocacy in a case before him has been continually condemned . . . [j]udges in this state are given wide latitude to comment fairly and reasonably upon evidence received at trial, and such comments are not improper merely because they tend to point out strengths, weaknesses, or difficulties of a particular case." (Citations omitted.) *State* v. *Echols*, 170 Conn. 11, 14, 364 A.2d 225 (1975).

In the present case, the trial court did not become an advocate for one of the parties in the case. The trial

court properly commented on the evidence before it in an attempt to simplify the proceedings. At the time the court commented on the videotape, the state had proposed to enter an actual 1983 Jeep Wagoneer into evidence and the trial court had just granted the defendant's motion in limine excluding the state's initial videotape of the Jeep. As the trial court indicated when the defendant objected at trial, the court's suggestions to the state were intended to ensure against further evidentiary problems regarding a demonstration of the Jeep's seat mechanism. The trial court was not advocating the credibility of the state's videotape, but merely was giving the state guidelines as to what contents would be admissible in its revised videotape. Therefore, the trial court was within its discretion and its comments are not grounds for excluding the videotape.

For the foregoing reasons, we cannot conclude that the trial court abused its discretion in admitting certain segments of the videotape. A pivotal issue for the jury in this case was deciding whether the victim's version of the events that allegedly occurred inside the Jeep was physically and mechanically possible and the admitted portions of the videotape therefore were admissible.

## IX

We next consider whether the trial court improperly granted the state's motion in limine to exclude the proffered testimony of Frederic Rieders, a physician who testified as an expert witness for the defendant. We conclude that the trial court's ruling excluding Rieders' testimony was proper.

The trial court held a hearing on the motion which included three days of testimony. The testimony in question related to two bloodstains, one taken from the carpet of the rear cargo area of the Jeep, and the other from the undergarments worn by the victim on the night

of the incident. Both parties stipulated that the stains examined contained the blood of the victim.

Rieders did not himself perform any independent tests on the victim's undergarments, but, rather, sought to present his contrary interpretation of the results of tests conducted by the state's expert witness, Dennis J. Crouch, an assistant director of the Center for Human Toxicology in Salt Lake City, Utah. Crouch's proffered testimony was also excluded at trial. Crouch had performed a radioimmunoassay test on the bloodstain followed by a gas chromatography mass spectroscopy. Based on the data from those two tests, Crouch concluded that no drug metabolites were detectable in the stain. Rieders' extrapolation of the data, however, indicated that cocaine and marijuana metabolites were present in the stain sample. Additionally, Rieders independently tested the carpet bloodstain using a multiple enzyme immunoassay test (EMIT). On the basis of that test, he concluded that the stain indicated the presence of cocaine and marijuana metabolites. The trial court granted the state's motion to exclude Rieders' testimony.

### A

In *State* v. *Porter*, 241 Conn. 57, 66–68, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), this court adopted the standard for admissibility of scientific evidence as set forth by the United States Supreme Court in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587–89, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), which disavowed and liberalized the previously held "general acceptance" standard for scientific evidence established in *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923). "[A]t present, Connecticut nominally follows the *Frye* rule. . . . We believe that . . . the *Daubert* [reliability] approach will provide structure and guidance to what

has until now been a potentially confusing and sparsely defined area of legal analysis in our state jurisprudence. . . . Accordingly, we conclude that the *Daubert* approach should govern the admissibility of scientific evidence in Connecticut." (Citations omitted; internal quotation marks omitted.) *State* v. *Porter,* supra, 66–68.

Under *Daubert,* before proffered scientific evidence may be admitted, the trial court must determine whether the proffered evidence will " 'assist the trier of fact . . . .' " *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* supra, 509 U.S. 589. "This entails a two part inquiry: whether the reasoning or methodology underlying the [scientific theory or technique in question] is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue. . . . In other words, before it may be admitted, the trial judge must find that the proffered scientific evidence is both reliable and relevant. More specifically, the first requirement for scientific evidence to be admissible . . . is that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation." (Citations omitted; internal quotation marks omitted.) *State* v. *Porter,* supra, 241 Conn. 63–64, citing *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* supra, 592–93.

"The [*Daubert*] court listed four nonexclusive factors for federal judges to consider in determining whether a particular theory or technique is based on scientific knowledge: (1) whether it can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, including the existence or maintenance of standards controlling the technique's operation; and (4) whether the technique is, in fact, generally accepted in the relevant scientific community. [*Daubert* v. *Merrell*

*Dow Pharmaceuticals, Inc.,* supra, 509 U.S.] 593–94."
*State* v. *Porter,* supra, 241 Conn. 64. The court in *Daubert* further articulated, however, that the inquiry "is
. . . a flexible one." *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* supra, 594. To the extent that they focus on the reliability of evidence as ensured by the scientific validity of its underlying principles, [other factors] may well have merit . . . ." Id., 594–95 n.12.

Under *Daubert,* scientific evidence must also fit the case in which it is presented. Id., 591. "In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract." *State* v. *Porter,* supra, 241 Conn. 65. Finally, the *Daubert* court emphasized that even if a scientific theory or technique would be admissible under the aforementioned criteria, it can still be excluded for failure to satisfy some other federal rule of evidence. *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* supra, 509 U.S. 595. Most important, proffered scientific testimony can still be excluded for failure to satisfy rule 403 of the Federal Rules of Evidence, which allows for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." (Citations omitted; internal quotation marks omitted.) *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* supra, 595.

## B

It is well settled that "[t]he trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *State* v. *McClendon,* 248 Conn. 572, 585–86, 730 A.2d 1107 (1999).

After three days of testimony, the trial court held that Rieders' testimony concerning both bloodstains would be excluded as neither relevant nor material because it failed to comport with standards of admissibility for expert scientific testimony. Although *Porter* had not been decided on April 7, 1997, the trial court excluded the testimony as inadmissible under both *Frye* and *Daubert*. After properly restating both the *Frye* and *Daubert* tests, the trial court proceeded to systematically analyze the facts in light of the nonexclusive *Daubert* factors and concluded that Rieders' testimony and methodology did not satisfy any of those factors. The trial court properly relied on the fact that: (1) Rieders did not follow up the less reliable EMIT test with a confirmatory gas chromatography mass spectroscopy test;[25] (2) using the EMIT test for dried blood samples was a new procedure not recognized as accurate in the relevant community under *Frye* or *Daubert*; and (3) there was no peer review, no manual, no standard operating procedures within the laboratory, no cutoffs established, no independent validation done, nor any publication in peer reviews or other published articles by Rieders concerning his scientific methodology. We conclude that the trial court properly applied *Porter* and *Daubert* in excluding Rieders' testimony.

Additionally, the trial court found the proffered testimony inadmissible under other evidentiary principles, namely, relevancy and materiality. Thus, even assuming arguendo that Rieders' methodology had, in fact, met the first part of the *Daubert* test, the trial court properly ruled the evidence inadmissible because "proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract." *State* v. *Porter*,

---

[25] "[A] presumptive test for blood . . . [has] no probative value whatsoever . . . ." (Internal quotation marks omitted.) *State* v. *Moody*, 214 Conn. 616, 628, 573 A.2d 716 (1990).

supra, 241 Conn. 65. Since Rieders' proffered testimony was imprecise, and he could not narrow the time frame as to when any possible drug ingestion by the victim might have occurred, the trial court properly found that the testimony was not relevant to the issues before it. Assessing the probative value of Rieders' proposed testimony, the trial court correctly concluded that the mere fact that the victim may or may not have ingested cocaine and marijuana at some indeterminate time in the past was not relevant to the issues in this case.

The defendant also argues that the trial court's decision to exclude Rieders' testimony prevented him from properly impeaching the victim's credibility, and therefore, violated his constitutional right to present a defense under the fifth, sixth, and fourteenth amendments to the United States constitution, and article first, § 8, of the Connecticut constitution. We disagree. The defendant was able to and did in fact present testimony as to the victim's alleged drug use and its possible effects on her inhibitions through two other experts, Kevin Ballard, a physician specializing in the field of mass spectrometry, and Kurt Dubowski, a physician and forensic toxicologist. Therefore, the defendant's right to present a defense was not violated.

## X

The defendant next claims that the trial court improperly denied his motion to dismiss based on the dissemination of prejudicial information about the defendant by the state, and improperly denied the defendant's request for an evidentiary hearing on that issue. We disagree.

Certain additional facts are necessary to the resolution of this issue. Prior to the start of trial, the defendant filed an amended motion to dismiss, alleging that the state and the victim's attorney had "leaked information to the media and made public statements to the media

which were designed to frustrate the defendant's ability to receive a trial by a fair and impartial jury." The defendant also requested an evidentiary hearing in order to offer proof of this alleged misconduct. The trial court denied both the defendant's motion to dismiss and his request for an evidentiary hearing.

### A

We consider first the defendant's claim that the trial court improperly denied his motion to dismiss. The decision whether to grant a motion to dismiss a criminal charge rests within the sound discretion of the trial court, and is one that we will not disturb on appeal absent a clear abuse of that discretion. See *State* v. *Corchado*, 200 Conn. 453, 458–59, 512 A.2d 183 (1986); *State* v. *Safford*, 21 Conn. App. 467, 471–72, 574 A.2d 1305, cert. denied, 216 Conn. 803, 577 A.2d 717 (1990). We conclude that the trial court did not abuse its discretion in denying the defendant's motion.

As we discussed in part II of this opinion, although this case was the subject of much media attention, the defendant's trial did not take place in an "atmosphere utterly corrupted by press coverage." (Internal quotation marks omitted.) *State* v. *Crafts*, supra, 226 Conn. 258. That is the standard against which any claim of prejudicial publicity must be judged and, in this case, the defendant has failed to establish that the information given to the media created an atmosphere inimical to the administration of justice. Moreover, regardless of any statements made by the victim's attorney[26] to the press, the exhaustive voir dire that took place in this case, in which the defendant was granted twice

---

[26] In his brief, the defendant repeatedly argues that these statements were made by "the state and its agent, the complainant's attorney . . . ." In fact, of the nine examples cited by the defendant in his brief, eight were statements made by the victim's attorney, while only one example involves the prosecutor in any manner.

the usual number of peremptory challenges, that, as stated previously, he did not exhaust, served to eliminate any jurors who may have been prejudiced by those statements.

Neither the fact that the defendant's case was followed closely by the media and the public, nor the fact that some of that interest may have been the product of statements made to the media by the victim's attorney, leads us to conclude that the trial court abused its discretion in denying the defendant's motion to dismiss. See id. ("[p]rominence does not, in itself, prove prejudice"). Although a motion to dismiss may, in certain extreme circumstances, be the only suitable remedy for excessive pretrial publicity that renders the empaneling of an impartial jury truly impossible, we conclude that such an exigency did not exist in this case.

## B

We consider next the defendant's claim that the trial court improperly denied his request for an evidentiary hearing, in violation of his constitutional right to due process. "Inquiry into whether particular procedures are constitutionally mandated in a given instance requires adherence to the principle that due process is flexible and calls for such procedural protections as the particular situation demands. *Morrissey* v. *Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). There is no per se rule that an evidentiary hearing is required whenever a liberty interest may be affected. Due process . . . is not a technical conception with a fixed content unrelated to time, place and circumstances. . . . *Ingraham* v. *Wright*, 430 U.S. 651, 675, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977)." (Internal quotation marks omitted.) *State* v. *Lopez*, 235 Conn. 487, 492–93, 668 A.2d 360 (1995).

In the present case, the defendant argues that he should have been granted an evidentiary hearing so that

he could offer evidence of the state's complicity in the statements made to the media by the victim's attorney. It is true that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." (Internal quotation marks omitted.) *Standard Tallow Corp.* v. *Jowdy*, 190 Conn. 48, 56, 459 A.2d 503 (1983). That axiom presupposes, however, that the important decision with which the court is confronted concerns a question that is material to the case at bar. The question of whether the victim's attorney was acting as an agent of the state, or in conjunction with the state, when he made his statements to the media was, as a matter of law, immaterial to the resolution of the defendant's motion to dismiss. See *United States* v. *Curcio*, 712 F.2d 1532, 1544 (2d Cir. 1983) ("[e]ven publicity partly engendered by the Government would not warrant the extreme remedy of dismissal . . . before a voir dire"). The proper resolution of that motion turned not on the *source* of the pretrial publicity, but, rather, on the absence of a *pernicious effect* of that publicity on the jury pool.

Due process does not require that a defendant be given the opportunity to substantiate an immaterial claim. In this case, the question of whether the victim's attorney was acting at the state's behest had no bearing on the proper resolution of the defendant's motion to dismiss, the denial of which we decided in part X A of this opinion was not an abuse of the trial court's discretion. We conclude, therefore, that the trial court properly denied the defendant's request for an evidentiary hearing.

## XI

The defendant's next claim is that the trial court violated his federal and state constitutional rights by improperly considering, at the sentencing phase of the

proceedings, the defendant's decision to proceed to trial. See U.S. Const., amend. VI; Conn. Const., art. I, § 8. This claim is unavailing.

Certain additional facts are necessary to the resolution of this issue. At the conclusion of the defendant's sentencing hearing, and prior to imposing sentence, the trial court made certain comments regarding the factors that it had considered in reaching a sentencing decision. Specifically relevant to this issue, the court stated that "[t]he general factors which I have considered in this matter is whether or not there was a plea or a complete trial, and that is one of the legal factors to consider in sentencing."[27] The defendant contends that this comment improperly infringed upon his constitutional right to a jury trial.

As a general matter, a trial court possesses, within statutorily prescribed limits, broad discretion in sen-

---

[27] The court's complete statement regarding the factors that it had taken into account in sentencing the defendant was as follows: "The general factors which I have considered in this matter is whether or not there was a plea or a complete trial, and that is one of the legal factors to consider in sentencing. Whether the motive accomplished—of accomplishing the act was either need—was need or greed, the defendant's degree of involvement, the violence and/or its potential for violence, physical injury to the victim, the mental injury to the victim, the relationship between the [d]efendant and the victim, the degree of planning, and the statutory seriousness of the offense convicted of.

"Mitigating factors which I have considered are age of the defendant, intelligence, school record or work record, prior criminal record, record since the offense in question, remorse, either drug addiction or alcohol involvement, mental problems, attitude, family support and community support.

"The law requires me to consider each and every single one of those factors in pronouncing the sentence and I have done so.

"I have given special consideration to five factors that I have noted here: the age of [the victim] a week after her sixteenth birthday; the age of [the defendant], a high school teenager; the lack of closure of this matter for a period of eleven years; the fact that this sentence is not punishing [the defendant] for any matters for which he is currently awaiting disposition and/or trial.

"The final factor that I have considered is the rules on proportionality."

tencing matters. On appeal, we will disturb a trial court's sentencing decision only if that discretion clearly has been abused. See *State* v. *Daniels*, 248 Conn. 64, 73, 726 A.2d 520 (1999). In spite of that discretion, however, the "[a]ugmentation of sentence based on a defendant's decision to stand on [his or her] right to put the Government to its proof rather than plead guilty is clearly improper. *United States* v. *Araujo*, 539 F.2d 287, 291–92 (2d Cir.), cert. denied, 429 U.S. 983, 97 S. Ct. 498, 50 L. Ed. 2d 593 (1976)." (Internal quotation marks omitted.) *United States* v. *Hutchings*, 757 F.2d 11, 14 (2d Cir.), cert. denied, 472 U.S. 1031, 105 S. Ct. 3511, 87 L. Ed. 2d 640 (1985).

We have not addressed previously the precise issue that now confronts us, namely, whether the trial court's comments impermissibly infringed upon the defendant's constitutional rights, and the method by which we should make that determination.[28] The majority of courts that have considered this issue, however, either expressly have adopted a totality of the circumstances test, or have reviewed the entire record in a manner consistent with such a test. See, e.g., *United States* v. *Tracy*, 12 F.3d 1186, 1202 (2d Cir. 1993); *United States* v. *Medina-Cervantes*, 690 F.2d 715, 716–17 (9th Cir. 1982); *Frank* v. *Blackburn*, 646 F.2d 873, 884–85 (5th Cir. 1980), cert. denied, 454 U.S. 840, 102 S. Ct. 148, 70 L. Ed. 2d 123 (1981); *United States* v. *Araujo*, supra, 539 F.2d 291–92; *United States* v. *Thompson*, 476 F.2d 1196, 1201 (7th Cir.), cert. denied, 414 U.S. 918, 94 S. Ct. 214, 38 L. Ed. 2d 154 (1973); *Santana* v. *State*, 677 So. 2d 1339, 1340 (Fla. App. 1996); *State* v. *Brown*, 131 Idaho 61, 72, 951 P.2d 1288 (App. 1998); *State* v.

---

[28] In *State* v. *Rice*, 172 Conn. 94, 103, 374 A.2d 128 (1976), this court rejected the defendant's claim that the trial court imposed a harsher sentence on him in order to penalize him for proceeding to trial. The opinion in *Rice*, however, contains no substantive analysis of the issue, and therefore sheds no light on the present case.

*Eastman,* 691 A.2d 179, 184 (Me. 1997); *Mitchell* v. *State,* 114 Nev. 1417, 971 P.2d 813, 820–21 (1998); *State* v. *Bonilla,* 127 N.M. 566, 985 P.2d 168, 172 (App. 1999); *State* v. *Fitzgibbon,* 114 Or. App. 581, 586–87, 836 P.2d 154 (1992); *State* v. *Tiernan,* 645 A.2d 482, 487–88 (R.I. 1994). A minority of courts, on the other hand, have adopted a "per se" rule requiring a remand for resentencing whenever a colorable claim is raised by a defendant that his sentence was lengthened because of his choice to stand trial. See, e.g., *United States* v. *Capriola,* 537 F.2d 319, 320 (9th Cir. 1976); *Hess* v. *United States,* 496 F.2d 936, 938–39 (8th Cir. 1974); *People* v. *Wilson,* 43 Colo. App. 68, 71, 599 P.2d 970 (1979); *Johnson* v. *State,* 274 Md. 536, 542–43, 336 A.2d 113 (1975).

We choose to follow the majority approach and hold that review of claims that a trial court lengthened a defendant's sentence as a punishment for exercising his or her constitutional right to a jury trial should be based on the totality of the circumstances. We further hold that the burden of proof in such cases rests with the defendant. See *State* v. *Candito,* 4 Conn. App. 154, 159, 493 A.2d 250 (1985) ("[t]he defendant has not carried his burden of persuasion that . . . his sentence was the result of penalizing him for having exercised his right to a jury trial").

Confronted with claims similar to that of the defendant in this case, courts in other jurisdictions generally have required remarks by a trial judge to threaten explicitly a defendant with a lengthier sentence should the defendant opt for a trial, or indicate that a defendant's sentence was based on that choice. See, e.g., *United States* v. *Cruz,* 977 F.2d 732, 733 (2d Cir. 1992) (" 'I'm the kind of a judge where you get a fair trial . . . [but] [i]f I find that after the trial that you didn't have a defense at all, you're going to get the maximum, because you're playing games with me' "); *United States* v. *Hutchings,* supra, 757 F.2d 14 (judge stated at sen-

tencing that trial was "a 'total waste of public funds and resources . . . there was no defense in this case. [The defendant] was clearly and unquestionably guilty, and there should have been no trial.' "); *People* v. *Mosko*, 190 Mich. App. 204, 210, 475 N.W.2d 866 (1991) (" 'I am very concerned about this case . . . because it was a case that went to trial . . . [a]nd to get up on the stand and [be] sanctimonious and you're self-righteous and you're guilty, that seems to me to be something that is—that is beyond [decent]' ").

Where a trial court employed more ambiguous language, however, courts generally have rejected claims that the trial court infringed on the defendant's rights. See, e.g., *United States* v. *Tracy*, supra, 12 F.3d 1202 ("[The defendant] 'not only minimizes his role in this operation, but negates it. In other words, he claims there was really nothing going on here and that he has been unjustly and unfairly and illegally prosecuted by the government . . . .' "); *State* v. *Brown*, supra, 131 Idaho 73 (" 'You want to maintain your innocence, that's fine. The evidence shows otherwise. And you have to suffer the consequence. . . . I find that you have abused the justice system and you are paying a consequence because of that.' "); *State* v. *Tiernan*, supra, 645 A.2d 487 (defendant " 'required [the victim] to testify' by exercising his right to stand trial").

In this case, the totality of the circumstances surrounding the defendant's sentencing gives no indication that the trial court improperly augmented the defendant's sentence based on his decision to stand trial. As the trial judge noted, he gave particular consideration to the age of the victim, the age of the defendant, the lack of closure of the matter for the eleven years preceding the second trial, the fact that the sentence was not influenced by other criminal matters pending against the defendant and, finally, proportionality.

Certainly, the remarks that the defendant contends were improper are a far cry from the statements in *Cruz*, *Hutchings* or *Mosko*. Indeed, they are not even as severe as those in *Tracy*, *Brown* or *Tiernan*. No fair reading of the record would permit the conclusion that the trial court's comment should be understood to mean that it was lengthening the defendant's sentence based on his choice to stand trial. Rather, we interpret the trial court's remark as a reminder to the defendant of the oft acknowledged truth that "many factors favor relative leniency for those who acknowledge their guilt . . . and thus help conserve scarce judicial and prosecutorial resources for those cases that merit the scrutiny afforded by a trial." (Internal quotation marks omitted.) *State* v. *Coleman*, 242 Conn. 523, 544, 700 A.2d 14 (1997). There is a world of difference between that reminder and a clear showing that the defendant received a lengthier sentence because he chose to exercise his right to a jury trial.

XII

The defendant's next claim is that the trial court improperly denied his parents and fiancee the opportunity to speak at his sentencing in violation of his constitutional rights to due process and to effective assistance of counsel. This claim is without merit.

"It is undisputed that the defendant possesses a liberty interest that is implicated during the sentencing process. . . . [Therefore] the sentencing process, as well as the trial itself, must satisfy the requirements of the Due Process Clause. . . . The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process. . . . *Gardner* v. *Florida*, 430 U.S. 349, 358, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977)." (Internal

quotation marks omitted.) *State* v. *Patterson,* 236 Conn. 561, 570, 674 A.2d 416 (1996).

Even though the defendant's right to due process is implicated by the procedures employed in sentencing, a trial court, in its discretion, may impose reasonable limitations on the manner in which information is presented at sentencing. "All that [due process requires] is that the procedures be tailored, in light of the decision to be made, to the capacities and circumstances of those who are to be heard . . . to insure that they are given a meaningful opportunity to present their case." (Internal quotation marks omitted.) Id., 571–72; *Mathews* v. *Eldridge,* 424 U.S. 319, 348–49, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

At the time of the defendant's sentencing in 1997, Practice Book § 919 (3), now § 43-10 (3)[29] required that the trial court "allow the defendant a reasonable opportunity to make a personal statement in his or her own behalf and to present any information in mitigation of sentence." Although the defendant's parents and fiancee were not permitted to speak at sentencing, it is undisputed that the trial court granted the defendant permission to read their statements into the record, an opportunity that the defendant voluntarily chose to forgo. This was precisely the same opportunity that the trial court gave to the victim's parents and supporters, and it was more than adequate to ensure the defendant's right to present mitigation evidence. Moreover, the trial court acknowledged having received and read the statements of the defendant's parents on the day of sentencing. We conclude, therefore, that the trial court did not violate the defendant's constitutional rights by refusing

[29] Practice Book, 1997, § 919 provides in relevant part: "Before imposing a sentence . . . the judicial authority shall . . . conduct a sentencing hearing as follows . . . (3) [t]he judicial authority shall allow the defendant a reasonable opportunity to make a personal statement in his or her own behalf and to present any information in mitigation of sentence. . . ."

to allow his parents and fiancee to speak at his sentencing.

## XIII

The defendant's final claim is that the trial court violated the constitutional prohibition against ex post facto laws[30] in two respects: first, by imposing a sentence that included a ten year probationary period; and second, by requiring the defendant to register as a sexual offender in accordance with General Statutes (Rev. to 1997) § 54-102r, as amended by No. 97-183, § 1, of the 1997 Public Acts,[31] and General Statutes (Rev. to

---

[30] U.S. Const., art. I, § 9.

[31] General Statutes (Rev. to 1997) § 54-102r, as amended by No. 97-183, § 1, of the 1997 Public Acts, as it applied when the court rendered judgment sentencing the defendant to probation provides: "Registration of persons convicted of sexual assault upon release from correctional facility or completion or termination of probation. (a) For the purposes of this section: (1) 'Sexual assault' means (A) a violation of subdivision (2) of section 53-21, section 53a-70, 53a-70a, 53a-70b, 53a-71, 53a-72a or 53a-72b or (B) any crime committed in any other state or jurisdiction the essential elements of which are substantially the same as any of the crimes enumerated in subparagraph (A) of this subdivision; (2) 'sentence termination date' means the scheduled date of release from the correctional system if the convicted person served the maximum term or terms for which he was sentenced, without being released on parole, receiving a reduction in such sentence for good conduct and obedience to rules or receipt of an outstandingly meritorious performance award, or on account of any other early release provision; (3) 'probation termination date' means the date that supervision by the Office of Adult Probation ends for a person sentenced to a period of probation.

"(b) Whenever a person who has been convicted of sexual assault or has been found not guilty of sexual assault by reason of mental disease or defect pursuant to section 53a-13 is to be released from the supervision of the Office of Adult Probation upon completion or termination of a sentence of probation or is to be released from a correctional facility in this state either by the Board of Parole prior to his sentence termination date or by the Department of Correction upon the completion of the maximum term or terms of the sentence, or is to be conditionally released by the Psychiatric Security Review Board pursuant to section 17a-588 or upon the termination of commitment to the Psychiatric Security Review Board, said office, board or department, as the case may be, shall, not later than five days prior to such release or termination of commitment to the Psychiatric Security Review Board, register such person with the chief of police of the police department or resident state trooper for the municipality in which such

1997) § 54-102s.[32] We agree that the trial court violated

person will reside.

"(c) Whenever a person who has been convicted of sexual assault and has been released on probation in any other state or jurisdiction or has been released from a correctional facility in any other state or jurisdiction, whether on parole or upon completion of the maximum term or terms to which he was sentenced, establishes residence in this state prior to a date that is ten years after his probation termination date or sentence termination date, as the case may be, such person shall register with the chief of police of the police department or resident state trooper for the municipality in which he resides not later than five days after establishing residency in this state. Any person who violates the provisions of this subsection shall be guilty of a class A misdemeanor.

"(d) Any person subject to the registration provisions of subsection (b) or (c) of this section who, prior to the date that is ten years after his probation termination date or sentence termination date, as the case may be, changes his or her residence address within this state shall, not later than five days after such change, register with the chief of police of the police department or resident state trooper for the municipality of his new address. Any person who violates the provisions of this subsection shall be guilty of a class A misdemeanor.

"(e) The registration required by subsections (b) to (d), inclusive, of this section shall be in a form prescribed by the Department of Public Safety and shall include the following information about the person being registered, where applicable: (1) Name, including all aliases used, (2) address, (3) social security number, (4) inmate number, (5) crime for which convicted or found not guilty by reason of mental disease or defect, (6) date and place of conviction or finding of not guilty by reason of mental disease or defect, (7) probation termination date or sentence termination date or date of termination of commitment to the Psychiatric Security Review Board, as the case may be, and (8) a complete description of the person including photograph and fingerprints.

"(f) A law enforcement agency shall maintain a registration on a person for ten years after such person's probation termination date or sentence termination date and shall destroy such registration at that time unless such person has been convicted of a subsequent sexual assault since his release."

Section 54-102r subsequently was repealed, effective October 1, 1998, by No. 98-111, § 12, of the 1998 Public Acts. Hereinafter, references to § 54-102r are to the 1997 revision as amended by the 1997 Public Act.

[32] General Statutes (Rev. to 1997) § 54-102s, which was applicable when the court rendered judgment sentencing the defendant to probation provides: "Notification of change of address of sexual offenders on parole or probation. (a) For the purposes of this section, 'sexual offender' means any person convicted of a violation of subdivision (2) of section 53-21, section 53a-70, 53a-70a, 53a-70b, 53a-71, 53a-72a or 53a-72b committed on or after October 1, 1995.

the constitutional prohibition on ex post facto laws by sentencing the defendant to ten years probation following his prison term, but disagree that requiring the defendant's registration as a sexual offender gives rise to the same impropriety.

A

It is well established that "the constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them." *Collins* v. *Youngblood*, 497 U.S. 37, 41, 110 S. Ct. 2715, 111 L. Ed. 2d 30 (1990). Moreover, the ex post facto clause prohibits a state from enforcing a law that "imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment [than] that [which was] then prescribed . . . ." *Cummings* v. *Missouri*, 71 U.S. 277, 325–26, 18 L. Ed. 356 (1867), accord *Weaver* v. *Graham*, 450 U.S. 24, 28, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981); *Payne* v. *Fairfield Hills Hospital*, 215 Conn. 675, 683, 578 A.2d 1025 (1990).

"(b) Any sexual offender who is released from a correctional institution on parole or who is sentenced to a period of probation shall, during the period of such parole or probation and as a condition of such parole or probation, immediately notify his parole officer or probation officer, as the case may be, whenever he changes his residence address. Each parole officer or probation officer who is notified of such change of address shall notify the chief of police of the police department or resident state trooper for the municipality of the new address of the parolee or probationer and any other law enforcement official he deems appropriate.

"(c) Nothing in this section or section 54-102r shall be construed to prohibit a parole officer or probation officer acting in the performance of his duties and within the scope of his employment from disclosing any information concerning the parolee or probationer to any person whenever he deems such disclosure to be appropriate."

This section was transferred to General Statutes § 54-260 in 1999. The only amendment was the deletion of the words "or section 54-102r" in subsection (c) to reflect the repeal of § 54-102r by No. 98-111, § 12, of the 1998 Public Acts. See footnote 31 of this opinion. Hereinafter, all references to § 54-102s are to the 1997 revision of the statute.

In 1986, when the offense in the present case was committed, the maximum term of probation for a felony conviction, including a violation of § 53a-70, the criminal statute upon which the defendant's conviction was based, was five years. See General Statutes (Rev. to 1985) § 53a-29 (d). In 1995, the legislature, in response to a growing concern about sex offender recidivism, amended the revision of § 53a-29 then in effect by enacting No. 95-142, § 2, of the 1995 Public Acts, to require the term of probation to be set at not less than ten nor more than thirty-five years[33] for a defendant convicted of violating § 53a-70. See General Statutes § 53a-29 (e).

The trial court imposed a probationary term of ten years in accordance with the amended statute in effect at the time of sentencing rather than the statutory provision in effect at the time the crime was committed. The trial court acknowledged uncertainty regarding whether the later statute applied to the defendant's case and indicated that the probationary term should be reduced to five years if that were found to be inapplicable.

The state does not dispute that the statutory provision providing for a minimum ten year probationary period relied upon by the trial court in this case was not enacted until nine years after the defendant committed the crime. The state contends, however, that a longer probationary period does not amount to an increased punishment. We disagree.

"[A] fixed term of probation is itself a punishment that is criminal in nature." *Hicks* v. *Feiock*, 485 U.S. 624, 639 n.11, 108 S. Ct. 1423, 99 L. Ed. 2d 721 (1988). "The element of 'punishment' in probation . . . of [a]

---

[33] A prior amendment to § 53a-29 in 1993 had provided for a term of probation "not more than thirty-five years . . . ." 1993 Public Acts, No. 93-340, § 12.

defendant is attributable to the crime for which he was . . . convicted and sentenced. . . . [T]he violation of the special condition was 'punishment' for the crime of which he had originally been convicted." *State* v. *Smith*, 207 Conn. 152, 178, 540 A.2d 679 (1988).

By employing § 53a-29, as amended by No. 95-142, § 2, of the 1995 Public Acts, which increased the fixed probationary term beyond the scope of the statute in effect in 1986, the trial court improperly imposed "additional punishment," more than that which was prescribed at the time of the offense, in violation of the ex post facto clause of the United States constitution. As to this discrete issue, we direct the trial court to reduce the probationary period to five years in compliance with the statutory provision as it existed in 1986.

## B

The defendant also contends that the trial court further violated the ex post facto clause by imposing a sentence that required him to register as a sex offender in accordance with §§ 54-102r and 54-102s.[34] Those sections, commonly referred to as Megan's Law, were enacted in 1994 and 1995, respectively, and § 54-102r was amended in 1997. Megan's Law requires that a sexual offender register with the local chief of police or resident state trooper after establishing residency in the state and notify his or her parole or probation officer whenever he or she changes residence address. In turn, the parole or probation officer is required to notify law enforcement authorities of the change. See General Statutes (Rev. to 1997) § 54-102r (c), as amended by No. 97-183, § 1, of the 1997 Public Acts, and General Statutes (Rev. to 1997) § 54-102s (b). The defendant argues that these provisions are punitive and, therefore,

---

[34] The trial court further ordered that, if the defendant no longer resides in Connecticut at the completion of his probationary term, he is to comply with the Megan's Law equivalent in the state in which he then resides.

the requirement that he register under the statutes violates his constitutional right to be free from the application of ex post facto laws because, at the time he committed the offense, Connecticut did not mandate registration of sex offenders with community law enforcement. We disagree.

Although this court never has specifically addressed the issue, most other state and federal courts have held that registration statutes, similar to our § 54-102r, requiring convicted sex offenders to register with local authorities in the communities in which they reside, are regulatory and not punitive in nature.[35] Those courts have concluded that such regulatory measures do not constitute punishment as proscribed by the ex post facto clause.

[35] See *Russell* v. *Gregoire*, 124 F.3d 1079, 1087 (9th Cir. 1997), cert. denied sub nom. *Stearns* v. *Gregoire*, 523 U.S. 1007, 118 S. Ct. 1191, 140 L. Ed. 2d 321 (1998); *Doe* v. *Pataki*, 120 F.3d 1263, 1285 (2d Cir. 1997), cert. denied, 522 U.S. 1122, 118 S. Ct. 1066, 140 L. Ed. 2d 126 (1998); *E.B.* v. *Verniero*, 119 F.3d 1077, 1096–97 (3d Cir. 1997), cert denied sub nom. *W.P.* v. *Verniero*, 522 U.S. 1109, 118 S. Ct. 1039, 140 L. Ed. 2d 105 (1998); *Artway* v. *Attorney General of New Jersey*, 81 F.3d 1235, 1264–67 (3d Cir. 1996); *Roe* v. *Farwell*, 999 F. Sup. 174, 188 (D. Mass. 1998); *Lanni* v. *Engler*, 994 F. Sup. 849, 854–55 (E.D. Mich. 1998); *Doe* v. *Kelley*, 961 F. Sup. 1105, 1108–12 (W.D. Mich. 1997); *State* v. *Noble*, 171 Ariz. 171, 178, 829 P.2d 1217 (1992); *In re William M.*, 71 Cal. App. 4th 1320, 84 Cal. Rptr. 2d 394, 399 (1999); *People* v. *Logan*, 302 Ill. App. 3d 319, 705 N.E.2d 152, 160 (1998); *Spencer* v. *O'Connor*, 707 N.E.2d 1039, 1043–44 (Ind. App. 1999); *State* v. *Myers*, 260 Kan. 669, 678, 923 P.2d 1024 (1996), cert. denied, 521 U.S. 1118, 117 S. Ct. 2508, 138 L. Ed. 2d 1012 (1997); *State* v. *Manning*, 532 N.W.2d 244, 248–49 (Minn. App. 1995); *State* v. *Costello*, 138 N.H. 587, 590–91, 643 A.2d 531 (1994); *Doe* v. *Poritz*, 142 N.J. 1, 43, 662 A.2d 367 (1995); *People* v. *Longdon*, 285 App. Div. 2d 937, 685 N.Y.S.2d 877 (1999); *State* v. *Cook*, 83 Ohio St. 3d 404, 417, 700 N.E.2d 570 (1998), cert. denied, 525 U.S. 1182, 119 S. Ct. 1122, 143 L. Ed. 2d 116 (1999); *Williford* v. *Board of Parole & Post-Prison Supervision*, 137 Or. App. 254, 257, 904 P.2d 1074 (1995), review denied, 322 Or. 613, 911 P.2d 1231 (1996); *White* v. *State*, 988 S.W.2d 277, 278–79 (Tex. App. 1999); *Kitze* v. *Commonwealth*, 23 Va. App. 213, 217, 475 S.E.2d 830 (1996), cert. denied, 522 U.S. 817, 118 S. Ct. 66, 139 L. Ed. 2d 28 (1997); *State* v. *Ward*, 123 Wash. 2d 488, 500, 870 P.2d 295 (1994) (en banc); *Snyder* v. *State*, 912 P.2d 1127, 1131 (Wyo. 1996).

In one such case, the Second Circuit Court of Appeals upheld the constitutionality of the registration and notification provisions of New York's sex offender registration statute against an ex post facto challenge. See *Doe* v. *Pataki*, 120 F.3d 1263, 1285 (2d Cir. 1997), cert. denied, 522 U.S. 1122, 118 S. Ct. 1066, 140 L. Ed. 2d 126 (1998). The court held that New York's sex offender registration statute was regulatory, not punitive in nature. Id. In making its determination, the court applied a two part test. First, it looked at "whether [the legislature], in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. Second, where [the legislature] has indicated an intention to establish a civil penalty, [the court] inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention. In regard to this latter inquiry, [the court has] noted that only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground." (Internal quotation marks omitted.) Id., 1274.

In *Doe*, the court first determined that the legislature did not intend the statute to be punitive and that "the [statute's] text and core structural features reasonably bear out its stated nonpunitive goals of protecting the public and facilitating future law enforcement efforts." Id., 1277. The court then examined whether "the burdens accompanying public notification [and registration] are nonetheless 'so punitive in form and effect' as to negate the legislature's nonpunitive intent." Id., 1278.

In applying the second part of the test, the Court of Appeals relied upon the factors articulated in *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963), to determine whether the statute was punitive in fact. *Doe* v. *Pataki*, supra, 120 F.3d 1275. The *Mendoza-Martinez* factors, as set forth in *Doe*, include: "[w]hether the sanction involves an

affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . ." (Citation omitted; internal quotation marks omitted.) Id., 1275 n.13, quoting *Kennedy* v. *Mendoza-Martinez*, supra, 168–69. "[W]hether a sanction intended as regulatory or nonpunitive is 'so punitive in fact' as to violate the ex post facto prohibition is a highly context specific matter. . . . Sometimes one factor will be considered nearly dispositive of punitiveness 'in fact,' while sometimes another factor will be crucial to a finding of nonpunitiveness." (Citation omitted.) *Doe* v. *Pataki*, supra, 1275.

In *Doe*, the court found that the extent and control of the notification, the duration, form, and frequency of the registration, and the offender's opportunity to petition the court for relief from the duty to register, and the prohibition against unauthorized release or use of the registration information, combined to demonstrate the nonpunitive nature of the statute. Id., 1285. In addition, the court pointed to the fact that the "registration itself, which can usually be accomplished without public notice, (1) does not ordinarily result even in societal opprobrium or harassment, (2) does not serve the goals of criminal punishments, and (3) does not resemble any measures traditionally considered punitive." Id. The court determined that those aspects of New York's sex offender statute were evidence that the registration requirement was not punitive in nature. Id. The court also noted that although the statute deemed the failure to register a crime, that portion of the statute

was fully prospective. The court held that since the plaintiffs had not demonstrated by the clearest proof that New York's sex offender registration statute was punitive in effect, it was not punitive for ex post facto purposes. Id. We are persuaded by the reasoning in *Doe* and we adopt that reasoning in interpreting the registration provision of Connecticut's Megan's Law. Thus, we conclude that § 54-102r is regulatory and not punitive in nature. The trial court's application of the statute to the defendant does not constitute a violation of the ex post facto clause.

## C

The defendant further contends that § 54-102s,[36] is unconstitutional, because, in effect, it gives probation and parole officers the unrestrained discretionary power to disseminate sex offender registration information to the public. Subsequent to the filing of the briefs in this case, we addressed this very claim in *State* v. *Misiorski*, 250 Conn. 280, 738 A.2d 595 (1999). In *Misiorski*, we held that "[i]f a probation officer determines that public safety will be advanced by community notification, such notification is not prohibited by § 54-102s (c)." Id., 292. This court also held that "[n]otification to the public was a reasonable component of the defendant's sexual offender treatment . . . [and] a suitable means to aid and encourage [the defendant] . . . to bring about improvement in his conduct and condition." (Internal quotation marks omitted.) Id., 289. Additionally, the Court of Appeals for the Second Circuit upheld against an ex post facto challenge the Connecticut office of adult probation's notification policy, which was based on then § 54-102s. See *Roe* v. *Office of Adult Probation*, 125 F.3d 47, 54–55 (2d Cir. 1997) (notification not punitive in nature). Thus, we reiterate that § 54-102s does not give parole and probation officers the

---

[36] See footnote 32 of this opinion.

unrestrained discretionary power to notify the community that might give rise to ex post facto concerns.

Like New York's sex offender legislation, § 54-102s was enacted to protect the public from sex offenders. *State* v. *Misiorski*, supra, 250 Conn. 290–92 (explaining history of Megan's Law in Connecticut and throughout country). Since our Megan's Law was not enacted as a punitive measure and the defendant here has failed to demonstrate by the clearest proof that it is punitive in effect, we conclude that it is not punitive for ex post facto purposes.

The judgment is reversed with respect to the imposition of a ten year probationary period and the case is remanded to the trial court with direction to reduce the term of probation from ten years to five years; the judgment is affirmed in all other respects.

In this opinion NORCOTT, KATZ, SULLIVAN and LAVERY, Js., concurred.

MCDONALD, C. J., concurring. I agree with the majority and with Judge Landau that the testimony from the declarant's family and the police concerning her repeated accusations was harmless. In this respect it is important to note that the declarant previously had testified without objection that she made those accusations to her family and the police. Furthermore, there was testimony that the declarant was obviously distraught and extremely upset after she arrived home that evening. Her family questioned the teenager as to the cause and learned of the sexual assault. At this time the declarant was only five days beyond her sixteenth birthday and had been a virgin until offered a brief "ride home" by the defendant, whom she had just met. The next morning, when the police examined the cargo area of the Jeep Wagoneer that had been driven by the defendant, they found her maidenhead blood on the floor. Dr. Marilyn Kessler examined her that day and found

genital bruises and lacerations. The statements therefore were admitted along with strong circumstantial evidence of a sexual assault. That corroborating evidence also rendered their admission harmless; see *Idaho* v. *Wright*, 497 U.S. 805, 824, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); and gave them a sufficient indicia of reliability. See id., 831 (Kennedy, J., dissenting).

I also agree that the statements made to her father, mother, sister and brother that night were excited utterances and properly admissible. See *State* v. *Wargo*, 255 Conn. 113, 127–28, 763 A.2d 1 (2000); *State* v. *Stange*, 212 Conn. 612, 616–17, 563 A.2d 681 (1989). They were made when the declarant was in an obviously devastated condition. This led first her father and then her sister to ask what was wrong. Because of her youth,[1] her continuing extreme distress and fear, the statements had the required indicia of reliability despite her failure to tell her father what had happened when first asked. There was evidence that her later answers were prompted by the startling, terrifying and deeply personal nature of the attack. We have quoted *State* v. *Hill*, 121 N.J. 150, 158–59, 578 A.2d 370 (1990), in turn citing 4 J. Wigmore, Evidence (Chadbourn Rev. 1972) § 1135, p. 298, that "rape . . . more than any other violent crime . . . could shed shame and embarrassment on the victim." (Internal quotation marks omitted.) *State* v. *Troupe*, 237 Conn. 284, 295, 677 A.2d 917 (1996).

As to the police evidence, the defendant previously sought to impeach the complainant by cross-examining

---

[1] In youthful rape and sexual abuse cases, there is very often an indicia of reliability found in excited utterances. "[In] modern practice, particularly where children are the victims of sexual offenses, many courts have liberally interpreted the allowable period of time between the exciting event and the child's description of it. The theory of these courts is that the general psychological characteristics of children typically extend the period that is free of the dangers of conscious fabrication." 2 C. McCormick, Evidence (5th Ed. 1999) § 272.1, p. 212.

her about details of her written police statement. He also questioned her about inconsistencies between her testimony at the earlier trial and this trial. He claimed that the evidence in this trial was a recent fabrication. This led to the proper admission of a part of the written police statement as a prior consistent statement used to rehabilitate her credibility. See *State* v. *Valentine*, 240 Conn. 395, 412–13, 692 A.2d 727 (1997); *Thomas* v. *Ganezer*, 137 Conn. 415, 419–20, 78 A.2d 539 (1951).

Although the majority does not directly decide if repeated accusations should be admissible as constancy of accusation evidence, its reference to *State* v. *Parris*, 219 Conn. 283, 294, 592 A.2d 943 (1991), appears to sanction their admissibility as " 'constant and consistent' " reports of sexual abuse.

Constancy of accusation had as its original rationale that it is "natural" for the true victim of rape to make a "fresh complaint." See *State* v. *De Wolf*, 8 Conn. 92, 100 (1830). In keeping with that rationale, the complaint was to be "fresh" or made shortly after the incident. *State* v. *Ouellette*, 190 Conn. 84, 98–100, 459 A.2d 1005 (1983). As Wigmore observes, "Now, when a woman charges a man with a rape, and testifies to the details, and the accused denies the act itself, its very commission thus coming into issue, the circumstance that at the time of the alleged rape the woman said nothing about it to anybody constitutes in effect a self-contradiction . . . . It was entirely natural, after becoming the victim of an assault against her will, that she should have spoken out. That she did not, that she went about as if nothing had happened, was in effect an assertion that nothing violent had been done." 4 J. Wigmore, supra, § 1135, p. 298.

In modern times, that rationale has been largely abandoned. *State* v. *Troupe*, supra, 237 Conn. 300–301; *State* v. *Parris*, supra, 219 Conn. 288–91; see also note, "The

New Face of Connecticut's Constancy of Accusation Doctrine: *State v. Troupe*," 29 Conn. L. Rev. 1713, 1718–22 (1997) (analysis of doctrine's evolution through Connecticut's case law). The present justifications for the doctrine's existence is that the evidence is a powerful weapon to secure justice in sexual assault prosecutions; see *State* v. *Sullivan*, 244 Conn. 640, 645–46, 712 A.2d 919 (1998); *State* v. *Dabkowski*, 199 Conn. 193, 202, 506 A.2d 118 (1986); and that it addresses the fact that there may be benighted jurors who still believe it only "natural" that the victim would complain immediately. *State* v. *Troupe*, supra, 300–302.

As to the first justification, of course, the prior consistent statements of any state's witness to any crime would be powerful weapons, as would those of any defense witness, including the accused, especially if those statements were repeated. We simply do not permit such evidence. "Prior consistent statements are self-serving in nature and their admissibility creates a motive and opportunity to manufacture corroborating evidence." C. Tait & J. LaPlante, Connecticut Evidence (Sup. 2000) § 11.22.1.

As to the second justification, the immediacy of the accusation is not a condition of admissibility, nor is the evidence restricted to the original complaint. A suggested amendment to rule 801 (d) (1) of the Federal Rules of Evidence, in keeping with this justification, would restrict the evidence to the initial and not subsequent accusations.[2] I would limit constancy of accusation evidence in this manner.

---

[2] The Federal Rules of Evidence make no explicit provision for the admission of a statement of prompt complaint of sexual abuse against the complainant's will. M. Graham, "The Cry of Rape: The Prompt Complaint Doctrine and the Federal Rules of Evidence," 19 Willamette L. Rev. 489, 490 (1983). In this article, Graham has proposed an amendment to rule 801 (d) (1), specifically addressing the doctrine. "Statements Which Are Not Hearsay . . . (d) . . . (1) Prior Statement by Witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . *(D) consistent with the declarant's*

In this case, the state presented evidence of repeated accusations after the initial complaint. The state's attorney also urged the jury to find the complaint credible because the complainant repeated her accusation to a number of witnesses in her family and to the police. Statements to the police by a complainant, particularly, are subject to the jury's interpretation that the police believed the complaint and acted to pursue and arrest the defendant. See *State* v. *Sullivan,* supra, 244 Conn. 676 (*McDonald, J.,* dissenting).

The danger in admitting repeated accusations is that they may result in an unfair and prejudicial chorus of supporting witnesses who have no firsthand knowledge vouching for the accuser. "Constancy accusations are admitted solely to overcome society's lingering prejudices in rape cases, not to permit the prosecution to manufacture testimony . . . ." C. Tait & J. LaPlante, supra, § 11.22.1.

Constancy of accusation does not require an indicia of reliability for the accusation, only that it may be considered as a "normal" reaction. In this respect, constancy of accusation evidence is distinct from other evidentiary rules that may allow the testimony. Although the majority rightly repeats *Troupe*'s caution that the trial court must carefully balance the probative value of the evidence against any prejudice to the defendant, I would not agree that the rationale for *Troupe* or fairness supports permitting repeated accusations as constancy of accusation. I would conclude that the repeated accusations to the family and later to the police should not have been admitted as constancy of accusation. On the other hand, excited utterances prompted by a startling and wrenching sexual assault or abuse may be admissible beyond the initial declaration

---

*testimony and is one of initial complaint of sexual abuse against the will of the declarant."* (Emphasis in original.) Id., 510.

because the later statements may have an indicia of reliability.

I concur in the remainder of the majority opinion.

LANDAU, J., concurring.[1] Although I believe that the trial court abused its discretion in admitting the testimony of the six constancy of accusation witnesses, I agree with the majority that the testimony was harmless for the reasons I discuss herein. I write separately, however, because I am of the opinion that the facts of this case provide this court with an opportunity to limit further the constancy of accusation doctrine.[2]

[1] In writing a concurrence, I recognize that I am not a full member of our Supreme Court and that I sat on this appeal by designation, pursuant to General Statutes § 51-207 (b). In its wisdom, the legislature has cloaked those judges who sit by designation with the same authority and responsibility as justices of our Supreme Court. I believe that I am duty bound to exercise the responsibility that accompanies that designation in all respects, including disagreeing with the majority.

[2] In a more perfect world, I would urge that Connecticut abolish the constancy of accusation doctrine with respect to the prosecution of sexual assault crimes against competent adults. I leave until another day the special concerns related to children and adults who may be under some form of disability.

The history of the constancy of accusation doctrine has been addressed in some detail. See *State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996); see also note, "The New Face of Connecticut's Constancy of Accusation Doctrine: *State v. Troupe*," 29 Conn. L. Rev. 1713, 1714–22 (1997). These sources agree that the doctrine is based in a public policy that evolved over the centuries from the English common law and first found voice in Connecticut in a nineteenth century case, *State* v. *De Wolf*, 8 Conn. 93 (1830). As an aside, I am not as convinced as those sources that *De Wolf* unequivocally supports the premise for which the case is often cited. "It is believed, that the decisions on the circuit do not perfectly harmonize on this subject, and it may be proper hereafter to settle it definitively; but as there is not a coincidence or opinion on this point, and as a majority of the Court concur in the opinion that the testimony was properly admitted, a discussion and decision of the general question, is waived." Id., 100. I am further convinced that the facts of that case greatly influenced the court. The victim, who was identified by name in the opinion, was deaf and mute and resided at the "American Asylum for the education of the deaf and dumb . . . ." Id., 94. The victim communicated the attempted rape in writing to one of her female teachers some time after the incident. Id. An instructor at the American Asylum testified that the deaf-mute "generally, have a sense

This court set forth the parameters for determining whether evidence is cumulative in *State* v. *Parris*, 219

of inferiority to other people, and, as a class, are easily intimidated; are credulous, sincere and submissive; and that this was [the victim's] character." Id., 101. (We note that in various reprints of volume 8 of the Connecticut Reports, the word "sincere" inadvertently was omitted from this quoted sentence. We quote the language here as cited in the original 1833 Connecticut Reports.)

Nonetheless, the public policy notion that a woman who has been raped or against whom a rape has been attempted will communicate the fact to a female friend evolved into the constancy of accusation doctrine. See *State* v. *Kinney*, 44 Conn. 153 (1876). That notion, however, was not held universally. "We are aware that the decision in this case goes farther than the courts have gone in England, and in most of the states in this country, but still we think the rule adopted in this case is more conducive to the ascertainment of truth than the rule elsewhere established." Id., 156.

Connecticut adhered to the constancy of accusation doctrine until a mere five years ago when this court modified it in *Troupe*. In refusing to abrogate the doctrine entirely, the court rationalized that our society still harbors vestiges of a male dominated world in that it is natural for a woman to complain to someone that she had been raped. *State* v. *Troupe*, supra, 237 Conn. 301–304. I use the word "rationalized" because the court did not base its reasoning on empirical evidence of the prevalence of that earlier belief in today's society but, rather, adopted the opinions of other state courts. Id., 301–302. This rationalization, however, flies in the face of all that social and medical science tells us about women's response to being raped. See *State* v. *Kelley*, 229 Conn. 557, 578, 643 A.2d 854 (1994) (*Berdon, J.*, dissenting), citing S. Estrich, "Rape," 95 Yale L.J. 1087, 1088–89 (1986). There is still shame associated with having been raped, a phenomena that this court's own opinions substantiates by adhering to a policy of not identifying victims of sexual assault. See footnote 3 of the majority opinion.

The doctrine is duplicitous as it stands for and perpetuates the notion that women are not to be trusted with respect to their sexuality and sexual behavior but society must then protect women from the infirmity it places on them. Although our courts apply the doctrine in a gender neutral fashion, the doctrine is borne of disparate treatment of men and women by our society in general. See note, supra, 29 Conn. L. Rev. 1733. If the social, political and judicial leaders in this country had taken the position that society was not yet ready to enforce the equal protection clause of the United States constitution with respect to minorities in our society, the civil rights movement of the second half of the twentieth century would not have secured any of the gains it did secure. Courts have helped shape public policy since the beginning of the common law. The time has come, I believe, that this court must lead the way for social change by holding that the testimony of a competent adult victim of a sexual assault is to be weighed in the same manner as that of any other crime victim.

Conn. 283, 592 A.2d 943 (1991). "A trial court's broad discretion to exclude evidence more prejudicially cumulative than probative certainly encompasses the power to limit the number of witnesses who may be called for a particular purpose. See *State* v. *DeMatteo*, 186 Conn. 696, 702–703, 443 A.2d 915 (1982). 'In excluding evidence on the ground that it would be only "cumulative," care must be taken *not* to exclude merely because of an *overlap* with evidence previously received. To the extent that evidence presents new matter, it is obviously not cumulative with evidence previously received.' . . . 2 D. Louisell & C. Mueller, Federal Evidence [1985] § 128." (Emphasis in original.) *State* v. *Parris*, supra, 293. In *Parris*, "each item of the state's constancy evidence, while overlapping in the sense that it related to the same incident, *pertained to a different statement that the victim had made to a different person at a different point in time.*" (Emphasis added.) Id., 293–94. In *State* v. *Troupe*, 237 Conn. 284, 303, 677 A.2d 917 (1996), this court did not alter this rule, but did limit the scope of constancy of accusation testimony.

---

The rule of law in this jurisdiction is that the trier of fact is the judge of a witness' credibility. See, e.g., *State* v. *Jarzbek*, 204 Conn. 683, 706, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988). The justification for keeping the constancy of accusation doctrine because it is difficult for a jury to determine who is credible in a "she said/he said" situation is contrary to reality. Everyday juries are asked to decide who is telling the truth in matters as mundane as who had the green light to more exceptional circumstances as to whether a physician explained the risks of a procedure to a patient. The trial court instructs the jury on the law and how to evaluate credibility. In the absence of a clear indication to the contrary, we presume that a jury follows the instructions with which it is charged. See, e.g., *State* v. *Raguseo*, 225 Conn. 114, 131, 622 A.2d 519 (1993). Our system of determining the truth includes a procedure to address a jury gone awry. See Practice Book § 42-43.

I respectfully assert that as we begin the twenty-first century, we should abandon a doctrine that is unfair to both men and women and follow the rules of evidence that apply in any other criminal matter.

Here, the state called six constancy of accusation witnesses,[3] all of whom testified as to the same facts. As such, their testimony was cumulative and should not have been admitted under our rule in *State* v. *Parris*, supra, 219 Conn. 293–94. Their testimony overlapped and did not present new material. In fact, their testimony was not necessary to associate the complaint with the pending charge as to the time, place and identity of the defendant; *State* v. *Troupe*, supra, 237 Conn. 304;[4] as the testimony of the victim's sister and the victim's gynecologist was sufficient. Furthermore, two pairs of constancy of accusation witnesses heard the victim's complaint simultaneously and, therefore, the victim's complaint was not made "to a different person at a different point in time." *State* v. *Parris*, supra, 294.

The majority in the present case dismisses the defendant's claim of prejudice, concluding that the testimony was not prejudicial although it was cumulative. In its analysis, the majority notes that our Appellate Court has upheld the admission of as many as eight constancy of accusation witnesses and cites those cases in footnote 13 of its opinion. The facts of those cases are distinguishable from the facts here. In *State* v. *Zoravali*, 34 Conn. App. 428, 440, 641 A.2d 796, cert. denied, 230 Conn. 906, 644 A.2d 921 (1994), and *State* v. *Parsons*, 28 Conn. App. 91, 105–106, 612 A.2d 73, cert. denied, 223 Conn. 920, 614 A.2d 829 (1992), both of which predate *Troupe*, the Appellate Court concluded that the testimony of various constancy witnesses was not overlap-

---

[3] I agree with the majority that the victim's sister and the victim's treating gynecologist were not constancy of accusation witnesses. Their testimony was admitted properly under the excited utterance and treating physician exceptions to the hearsay rule, respectively.

[4] I agree with the position taken by Justice Berdon in his concurrence in *Troupe* that testimony concerning the identity of the perpetrator is prejudicial. *State* v. *Troupe*, supra, 237 Conn. 318–19. The purpose of the constancy of accusation doctrine is to corroborate the victim's testimony that she had in fact complained and nothing more.

ping and was properly admitted pursuant to the rule in *Parris*. With respect to its reliance on *Parsons*, the majority's position is further weakened by the fact that of the eight constancy of accusation witnesses in that case, one was a nurse and another a physician who treated the victim at the hospital, and two others were social workers. *State* v. *Parsons*, supra, 105. Although the Appellate Court did not address whether the testimony of the nurse and the physician, and perhaps that of the social workers, may have been admitted properly under an exception to the hearsay rule, in light of this court's decision today, the testimony of those four witnesses probably was not constancy testimony.

I agree with the majority that the state built its case around the testimony of the victim and her gynecologist. The victim's testimony alone was sufficient to convict the defendant. The testimony of the victim's gynecologist was equally, if not more, damaging to the defendant. I believe that this court should seize the opportunity presented by the facts of this case to do more than merely caution the trial court about the admission of cumulative constancy testimony, by providing firm guidance for the future.

In this case, aside from the victim's testimony, the gynecologist's testimony was the most relevant and material to the prosecution's case because it had a tendency to prove the use of force. See General Statutes (Rev. to 1985) § 53a-70.[5] To the extent that the medical evidence tended to prove the use of force, it precluded the need to rebut presumptively any defense of consent. See note, "The New Face of Connecticut's Constancy of Accusation Doctrine: *State v. Troupe*," 29 Conn. L. Rev. 1713, 1735–36 (1997). I suggest, therefore, that in

---

[5] To be consistent with the majority opinion, we refer to the revision of the statute in effect at the time of the commission of the offenses in this case. See footnote 1 of the majority opinion.

cases where the victim provides convincing testimony and the testimony of the victim's treating physician, based on a physical examination and medical evidence, supports the claim of the sexual assault, constancy of accusation testimony should not be admitted, unless the testimony is clearly "necessary to associate the victim's complaint with the pending charge . . . ." *State* v. *Troupe*, supra, 237 Conn. 304.

With the exception noted, I otherwise concur with the majority opinion.